# QUINCY, MISSOURI AND PACIFIC RAILROAD COMPANY *v.* HUMPHREYS.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

No. 223. Argued March 23, 1892. — Decided April 25, 1892.

A receiver appointed by order of a court of chancery is obliged to take possession of a leasehold estate, if it be included within the order of the court; but he does not thereby become the assignee of the term, or liable for the rent, but holds the property as the hand of the court, and is entitled to a reasonable time to ascertain its value, before he can be held to have accepted it as lessee.

The Wabash Company controlled 3600 miles of road, made up by the consolidation and leasing of many different railroads, upon nearly every one of which there existed one or more mortgages. Among them was the Quincy road, 77 miles in length, which was leased by the Wabash in August, 1879, for a term of 99 years, with privilege of renewal, acquiring with the lease a majority of the stock. The Quincy road at the time of the lease had issued mortgage bonds to the amount of $2,000,000, on which there was a large amount of interest in arrear. To provide for this and other floating debts, and to extend the road, a new issue of mortgage bonds was provided for as part of the arrangement, which were issued, and the road was completed, and entered into and formed part of the Wabash system. In May, 1884, the Wabash company filed a bill in equity, alleging that it was insolvent and could not procure the means to pay its floating debts and interest due, and praying the court to take possession of its property and administer it as a whole. Receivers were thereupon appointed, who took possession. They were

directed to pay out of the income which should come into their hands rental which had accrued or which might accrue upon all the company's leased lines, but to keep accounts showing the source of income and revenue with reference to expenditure. In June, 1884, the trustees under a general mortgage, which the Wabash company had made of its whole system, filed a cross bill praying for the foreclosure of their mortgage and the appointment of receivers; but the court declined to appoint receivers other than those already appointed. On the 26th of January, 1884, the receivers informed the court of their inability to pay interest falling due on certain classes of bonds and interest on certain stocks, and made a statement in regard to several of the consolidated and leased roads from which it appeared that the earnings of the Quincy road had at no time since its acquisition been sufficient to pay its operating expenses, the cost of its maintenance and the interest upon its mortgage bonds. The receivers further petitioned the court for its advice, and they were thereupon ordered to keep separate accounts of the earnings, incomes, operating expenses, cost of maintenance, taxes, etc., of each of such lines, and to make quarterly reports thereof. These reports, when made, showed, as to the Quincy Company, that in May, 1885, there was a deficit of $20,251.09 in nine months' working. The court thereupon made a general order, as to all the properties, which provided in substance that where there was no income, rental claims were not to be paid by the receivers. On the 15th of July, 1885, the trustees of the Quincy mortgage petitioned the court to direct the receivers to transfer that road and its rolling stock to them, and an order was made to that effect. No possession was taken under that order, but the leased property was retransferred before the sale under the foreclosure of the general mortgage of the Wabash Company. The proceedings under the cross bill resulted in a decree for such foreclosure on the 6th of January, 1886. No surplus was realized from the sale under that decree. The receivers' accounts on surrendering the property showed the net earnings to be $3,304,633.61 less than the amount of the preferred debts with whose payment they were charged. On the 8th of December, 1885, the intervening trustees of the Quincy mortgage filed a petition praying the court to order the receivers to pay arrears of interest, taxes, cost of repairs and rental, aggregating $114,380, and to decree them to be liens superior and paramount to all mortgages on all the property of the Wabash Company. On the 19th of March, 1888, the court denied this prayer and dismissed this petition from which decree the Quincy Company and the trustees took this appeal. *Held,*

(1) That the occupation of the Quincy road by the receivers under the order of court created no relation which obliged them to pay rent therefor under the lease;

(2) That no equities existed which called upon the court to divert the proceeds of the sale or the net earnings of the property while in the receivers' hands, and apply them to the payments prayed for by the intervenors;

(3) That the action of the court in appointing receivers on the application of the mortgagor could not be successfully challenged in this appeal.

THE court stated the case as follows :

The Quincy, Missouri and Pacific Railroad Company of Missouri owned in 1879 about seventy-seven miles of road extending westward from West Quincy towards the Missouri River ; had issued mortgage bonds to the amount of two million dollars; and owed, in addition to the principal of said bonds, a large amount of overdue interest accrued thereon. By an indenture made August 21, 1879, the railroad of this company was leased to the Wabash Railway Company for a period of ninety-nine years, with the option to the lessee to renew the same perpetually. By the terms of this contract a majority of the common stock of the Quincy Company was to be transferred to the Wabash Company, so as to give the latter control of the former, and a majority of directors in its board was to be elected in the interest of the Wabash Company. The Wabash Company was to supply $125,000 to the Quincy Company to enable it to complete the construction of its road to Milan, to a connection with the line of the Burlington and Southwestern Railroad, and was itself authorized to extend the road from Milan to its contemplated terminus at Brownville, on the Nebraska state line. A new mortgage was to be made, covering all the property of the Quincy Company, and securing bonds at the rate of $9000 per mile, which was to be used in retiring the bonds then outstanding and providing for future construction. Preferred stock of the Quincy Company was also to be issued and used in connection with the new bonds to liquidate its outstanding indebtedness, then estimated to be about $600,000.

The Wabash Company agreed to set aside certain percentages of the gross earnings derived from the operation of the Quincy Company's road and to apply these percentages, first, to the payment of interest on the new bonds, and, second, of dividends on the stock. The company guaranteed to pay interest on the bonds in the event that the said percentage of

gross earnings should be insufficient for that purpose; to maintain and operate the railroad of the Quincy Company, keeping the same in good condition and repair for the full term of the lease; and to pay all taxes.

It was further provided that if the principal of the bonds secured by the mortgage should become due in consequence of default in the payment of interest, the Quincy Company should have the option to forfeit the lease and reënter without process of law.

Under date of October 1, 1879, a mortgage was made by the Quincy Company, to Humphreys and Browning as trustees, whereby all its property, including leases and leasehold interests, was conveyed to the trustees to secure the payment of bonds to be issued at the rate of $9000 per mile; and the mortgage provided that a default of six months in the payment of interest might be availed of by the bondholders as a cause for declaring all the bonds forthwith due.

November 10, 1879, the Wabash Company was consolidated with other railroad companies, the consolidation forming the Wabash, St. Louis and Pacific Railway Company. This company received possession of the railway of the Quincy Company on July 1, 1880, and by the first of July, 1881, had extended the road from Milan to Trenton, a distance of about thirty-one miles.

On the 27th of May, 1884, the Wabash, St. Louis and Pacific Railway Company filed its bill in equity in the Circuit Court of the United States for the Eastern District of Missouri, stating that it was insolvent; that it had accumulated a floating debt for its maintenance of $4,784,145; that it was about to make default in interest payments; that such default would be ruinous to all parties interested in its maintenance and its revenues; and that the interest of all the creditors and bondholders would be thereby imperilled.

The bill made various persons and corporations parties defendant, having interests in the lines of the Wabash Company, as lessors, mortgagors or trustees under deeds of trust covering the lines or portions thereof, including the Central Trust Company and Cheney, trustees in a general mortgage; the

trustee in a collateral trust mortgage; the Quincy Company, and others; and prayed the court to appoint successors to trustees deceased, or to make such other order with respect thereto as would cause the respective trusts to be properly represented in the matters of the litigation; and to require the defendants to set up their several interests, so that the same might be fully represented.

The bill alleged that by their terms nearly all, if not quite all, the mortgages and trust deeds, whether executed by complainant or other companies on any portions of the line prior to the time when complainant acquired the same, not only embraced the roads and tangible property of the companies executing the instruments, but also the revenues and incomes to be derived from the use of the parts of the roads so mortgaged; that the bondholders had always insisted upon their right to look to the revenues of the sections of the road upon which their mortgages rested as a means of paying and discharging their bonds; that all, or nearly all, of the mortgages embraced all rolling stock to be thereafter acquired by the companies executing the mortgages, but as the lines of the original companies had been absorbed into complainant's system, the rolling stock on the entire system had become so intermingled as to be incapable of division according to the ownership of the several lines of road or according to the several mortgages; and that any attempt to control or dispose of portions of such rolling stock by courts not having jurisdiction of the whole and not competent to deal with the entire property as a unit would produce great confusion and uncertainty and result in great loss to all persons interested in the rolling stock or in complainant's property or securities.

The bill further averred that the complainant's directors and officers had thoroughly considered and already resorted to all proper means for obtaining the funds by which to pay the floating indebtedness of the company and meet the accruing interest falling due at the beginning of the month of June then next, and continuing to mature by instalments at very short intervals, but had wholly failed to provide the means with which to discharge the floating indebtedness and meet

the interest, and the company was powerless to accomplish such purpose, and was practically insolvent, and it was certain that a default would occur in June, and complainant be also without means of meeting the floating indebtedness.

It was further stated that complainant's interest in the road and the interests of all its creditors and bondholders were greatly imperilled by the existing prospect of the disruption of the road on the happening of the default; and that if the lines of railroad were broken up and the fragments thereof placed in the hands of various receivers, and the rolling stock, materials and supplies seized and scattered abroad, the result would produce irreparable injury and damage, not merely to complainant but to all persons having any interest in the road and the securities thereof. Complainant, therefore, "to prevent the breaking up of said lines of road and the scattering abroad of its assets," and "in order to the preservation of the interests of large numbers of persons, stockholders and creditors unknown to orator, and in order to the protection of the interests of all concerned, and to prevent a great multiplicity of suits," prayed the court to appoint one or more receivers, "and empower and direct such receiver or receivers to take possession of said entire property, and to preserve, operate and manage and control the same, collect all indebtedness due or to become due to orator, and otherwise to discharge all the duties ordinarily imposed by courts of equity on the receivers of railroad property by such courts appointed; that on a final hearing of said cause your honors will, under this bill, or under such amendments as may be made thereto, or such supplemental bills as shall be filed herein, or such cross-bills as parties in interest may also file, decree the sale of said entire property, whether such decree shall judicially foreclose said general mortgage or any of the other mortgages aforesaid, or whether such decree shall dispose of said property as a trust fund on general equitable principles; that your honors will cause all the liens upon said property or any part thereof and all rights, claims and equities of all persons interested therein to be ascertained, defined and determined, and that the proceeds arising from the sale of such property or any part

thereof be applied under the orders and decrees of this court, according to the rights, interests and equities of parties or persons interested in said fund ; " that all persons and all corporations having possession of complainant's property, or any part of it, be directed to surrender the same to such receiver or receivers as might be appointed, or to hold such property or portions of property under such receiver or receivers, if the latter shall elect to pursue such course ; and that such order may be made " as will insure the protection of the interests of orator and its creditors, giving an opportunity to all the defendants not served with notice to be heard hereafter ; and orator avers that no injury can arise to any creditor or person in interest from the appointment of the said receivers with or without notice, as such receivers' possession will inure to the benefit of all the persons concerned."

Upon the filing of the bill an order was thereupon made on the same day appointing Solon Humphreys and Thomas E. Tutt receivers of the railroads and property of the company ; and it was ordered " that the said receivers, out of the income that shall come into their hands from the operation of said railroad or otherwise, proceed to pay all balances due to other railroads or transportation companies, or balances growing out of the exchange of traffic accruing during six months prior hereto ; that said receivers also in like manner pay all rental accrued or which may hereafter accrue upon all leased lines of said complainant, and for the use of all terminals or track facilities, and all such rentals or instalments as may fall due from said complainant for the use of any portion of road or roads or terminal facilities of any other company or companies, and also for all rentals due or to become due upon rolling stock heretofore sold to complainant and partially paid for ; that said receivers also pay in like manner out of any incomes or other available revenues which may come into their hands all just claims and accounts for labor, supplies, professional services, salaries of officers and employés that had been earned or have matured within six months before the making of this order ; . . . that such receivers keep such accounts as may be necessary to show the source from which all such

income and revenues shall be derived with reference to the interest of all parties herein and the expenditures by them made."

The receivers qualified on May 29, 1884, and took possession of all lines of railroad which at that date were held or operated by the Wabash Company. On June 9, 1884, the trustees in the general mortgage appeared and filed their cross-bill, in which they prayed for the foreclosure of their mortgage and for the sale of the property, and also asked for the appointment of receivers; but the court refused to make such appointment. These trustees afterwards filed an amended cross-bill, and at a still later date an original bill in one of the state courts of Missouri, which was removed to the United States court, and consolidated with the original suit. These bills contained prayers for the foreclosure of the mortgage and the appointment of receivers.

June 26, 1884, the receivers petitioned the court for advice, stating that, from the incoming rents and profits of the property, they were unable to pay on the first day of June, 1884, the interest falling due on certain classes of bonds and dividends on certain specified stock. And they further stated, in respect of twenty-eight other classes of bonds enumerated in the petition, that the earnings of the lines upon which these bonds were secured had until this been sufficient to meet the operating expenses, cost of maintenance and interest payments, but in respect to ten other classes of bonds, of which the bonds of the Quincy Company constituted one, "that the earnings of none of the lines or divisions last above described have at any time since their acquisition been sufficient to pay their operating expenses, the cost of their maintenance, and interest on the several series of bonds and other obligations above described, and secured upon each of them respectively by mortgage or deeds of trust."

The petition was referred to a master, who reported thereon June 28, 1884, and recommended the entry of an order directing the receivers "from the incoming rents, and profits of said property, after meeting such other obligations as they have been directed to discharge by the former orders of this court,

to pay from whatever balance may remain in their hands the interest, as the same shall from time to time mature, upon the following bonds or other obligations secured by mortgage on the several lines or divisions" enumerated, whose earnings had been sufficient to pay the interest. The order further provided "that the receivers herein, until otherwise directed, keep the accounts of all the earnings and incomes from, as well as the accounts of all the operating expenses, cost of maintenance, and taxes upon, the following lines or divisions of said property separately, to wit," and here follow the lines which had not earned interest, including the Quincy Company; "and that said receivers make quarterly reports thereof, showing not only the income and expenses of each of the lines aforesaid, but also the methods by which the incomes and expenses of said lines were respectively ascertained;" and this report was confirmed.

On September 20, 1884, the receivers filed a petition for instructions as to interest due on bonds of the Havana division; and on October 15, 1884, the court stated, upon the matter being again brought up, that money that belonged to the underlying mortgages would not be taken to pay interest on non-earning branches.

December 16, 1884, the Quincy Company filed an intervening petition in which it set forth that interest on its bonds was in default and "that it has no means, property, or moneys aside from what is covered by said mortgage, and that it is without any means of paying said overdue and defaulted interest;" that it believed that, if default in the payment of interest should continue, the bondholders would require the sale of the mortgaged property under the terms of the mortgage; that it had applied to the president of the Wabash Company and others of its officers for information, but had been unable to obtain any, of an intention on the part of the company, or any one for it, to make such payment; and it prayed that the company or defendants, or some one of them, should pay the interest on the bonds in default July 1, 1884, or that such interest be paid out of the funds of the Wabash Company in the charge or under the control of the court or

the receivers, or that the court order that the lease between the petitioner and the Wabash Company be transferred to the St. Joseph and Quincy Railroad Company, which latter company would pay the interest coupons in arrears, and would either pay or give security to pay the interest coupons about to mature January 1, 1885, and would assume any and all liabilities resting upon the Wabash Company or to which it was subject by reason of the existence of or under said lease. This petition was answered by the receivers and the Central Trust Company and Cheney, trustee, and April 16, 1885, it was ordered that whenever within sixty days from that date the St. Joseph and Quincy Railroad Company should pay to the trustees on the first mortgage an amount equal to the coupons on the first mortgage of the Quincy Company due July 1, 1884, and January 1, 1885, in payment of said coupons, and should assume by proper agreement in writing the liabilities and obligations to be performed by the lessee under said lease, then said lease should become assigned and vested in the St. Joseph Company, freed from any liens or rights of the Wabash Company or the trustees under the general mortgage.

On January 8, 1885, the receivers reported the incomes and earnings from, as well as the operating expenses, cost of maintenance and taxes of, the Quincy Company, from May 29 to September 30, 1884, showing a deficit of $1416.78; and on the second of March, 1885, made a similar report showing a deficit of $9021.82 from October 1 to December 31, 1884; and on May 15, 1885, a report showing a total deficit up to February 28, 1885, for nine months, of $20,251.09. On March 20, 1885, the receivers filed a petition setting forth in detail the earnings and operating expenses of all the branch and leased lines of the Wabash Company from May 29 to November 30, 1884, and prayed orders with respect to the future operation of the lines, and concerning the payment of the respective rentals which the Wabash Company had agreed to pay. Upon this petition the court made an order, April 16, 1885, which was entitled: "In the matter of the application of the receivers for the cancellation of certain leases." By this order the

court directed: (1) "That subdivisional accounts must be paid separately." (2) "Where any subdivision earns a surplus over expenses, the rental or subdivisional interest will be paid to the extent of the surplus and only to the extent of the surplus." (3) "Where a subdivision earns no surplus, simply pays operating expenses, no rent or subdivisional interest will be paid. If the lessor or the subdivisional mortgagee desires possession or foreclosure, he may proceed at once to assert his rights. While the court will continue to operate such subdivision until some application be made, yet the right of a lessor or mortgagee whose rent or interest is unpaid to insist upon possession or foreclosure will be promptly recognized." (4) "Where a subdivision not only earns no surplus, but fails to pay operating expenses, as in the St. Joseph and St. Louis branch, the operation of the subdivision will be continued, but the extent of that operation will be reduced with an unsparing though a discriminating hand; that is, if a subdivision does not earn operating expenses, and receivers are running two trains a day, then lop one of them off; if they are running one train a day and still it does not pay, then run one train in two days. While the court will endeavor to keep that subdivision in operation, it will make the burden of it to the consolidated corporation, and to all the other interests put into that consolidated corporation, a minimum."

These directions were given in an opinion which was ordered to stand as the order of the court in respect to the matters therein referred to. 23 Fed. Rep. 863. July 15, 1885, Gilman and Bull, trustees under the mortgage of the Quincy Company, petitioned for the possession of its property. The petition was granted by the court and the receivers were ordered to surrender and transfer said property to the trustees on or before August 1, 1885, which was done.

On July 1, 1884, an instalment of interest on the bonds of the Quincy Company, for $36,120, became due and was not paid. On January 1, 1885, another like instalment became due and was not paid. On July 1, 1885, another like instalment became due and was not paid. The rent due for the month of July amounted to $6020, and was not paid. The

foregoing instalments aggregated $114,380. The taxes on the railroad of the Quincy Company for the year 1884 amounted to $16,000, and were not paid by the Wabash Company or the receivers, but by the trustees for the Quincy Company, who also made repairs upon said railroad at an expense of $15,000.

December 8, 1885, the trustees Gilman and Bull filed a petition, in which application the Quincy Company united June 12, 1886, by a separate petition. These petitions prayed that the court would order the receivers to pay to the Quincy Company or the trustees, for the bondholders, the sum of $114,380 for interest, $16,000 for taxes and $15,000 for necessary repairs, "being the rental due on account of the said lease of the property" of the company; and that the court would decree that said sums " are liens superior and paramount to all mortgages on all the property of the said Wabash, St. Louis & Pacific Railway Company." The prayer of the trustee's petition was confined to the sum of $114,380.

January 6, 1886, a decree was entered foreclosing the mortgages, upon the property of the Wabash Company, known as the general mortgage and the collateral trust mortgage. The court found due upon the general mortgage the principal sum of $17,000,000, and for interest $2,132,753.40, up to December 1, 1885; and upon the collateral trust mortgage the principal sum of $10,000,000 and $1,109,268.80 interest. In default of payment of these sums the court directed the sale of the mortgaged property, excluding, however, the property of the Quincy Company. The court decreed that the sale and conveyance of the mortgaged property should not have the effect of discharging any part of said property from the payment of claims that had been or might be charged against the same or the receivers by the court making the decree or any other Circuit Court exercising ancillary jurisdiction, or by any other court to which any of the parties to said decree had been remitted, and that the property should be subject to.be retaken, and if necessary, resold, if the sums so charged or to be charged against it or said receivers should not be paid within a reasonable time after being required by order of court. The

mortgaged property was thereupon sold, but no surplus realized.

The net earnings of the Wabash system from the time the receivers took possession to the time when they surrendered the road of the Quincy Company were $1,012,857.39, which was $3,304,633.61 less than the amount of preferred debt existing when the receivers took possession. The petitions of the trustees Gilman and Bull and of the Quincy Company were referred to a master who reported against the claims therein set forth. Exceptions were argued before the Circuit Court and overruled, the report confirmed and the petitions dismissed, whereupon the petitioners brought the case by appeal to this court. The opinions of Brewer, Circuit Judge, and Thayer, District Judge, will be found reported in 34 Fed. Rep. 259.

*Mr. D. H. Chamberlain* and *Mr. Everett W. Pattison* for appellants.

The receivers of the Wabash, St. Louis and Pacific Railway Company, having taken possession of and operated the railroad of the Quincy, Missouri and Pacific Railroad Company, from May 27, 1884, to August 1, 1885, must be held to have adopted the lease under which said railroad was held at the time of their appointment, and to have made themselves and the property in their hands liable to the lessor company according to the terms of such lease. *Thomas* v. *Pemberton*, 7 Taunt. 206; *Hanson* v. *Stevenson*, 1 B. & Ald. 303; *In re Oak Pits Colliery Co.*, 21 Ch. D. 322, 330, and cases there cited; *In re Lundy Granite Co.*, L. R. 6 Ch. 462; *In re South Kensington Coöperative Stores*, 17 Ch. D. 161; *In re Silkstone & Dodworth Coal & Iron Co.*, 17 Ch. D. 158; *In re Brown, Bailey & Dixon*, 18 Ch. D. 649; *In re Bridgewater Engineering Co.*, 12 Ch. D. 181; *Martin* v. *Black*, 9 Paige, 641; *S. C.* 38 Am. Dec. 574; *In re Brown*, 3 Edwd. Ch. 384; *Hoyt* v. *Stoddard*, 2 Allen, 442; *Boyce* v. *Bakewell*, 37 Missouri, 492; *Commonwealth* v. *Franklin Ins. Co.*, 115 Mass. 278; *Woodruff* v. *Erie Railway Co.*, 93 N. Y. 609; *Miltenberger* v.

*Logansport Railway,* 106 U. S. 286; *Vermont & Canada Railroad* v. *Vermont Central Railroad,* 50 Vermont, 500; *Langdon* v. *Vermont & Canada Railroad,* 53 Vermont, 230; *S. C.* 54 Vermont, 593; *Ex parte Faxon,* 1 Lowell, 404; *Fosdick* v. *Schall,* 99 U. S. 235; *Union Trust Co.* v. *Illinois Midland Railway,* 117 U. S. 434; *Ellis* v. *Boston, Hartford & Erie Railroad,* 107 Mass. 1; *In re New Jersey & New York Railway Co.,* 29 N. J. Eq. 67.

There are no circumstances in this case which should except it from this general rule.

*Mr. Edward W. Sheldon* filed a brief for appellants.

*Mr. James Thomson,* by leave of court, filed a brief for appellants.

*Mr. Wells H. Blodgett* and *Mr. Thomas H. Hubbard* for appellees.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

When the receivers were appointed, the Wabash Company consisted of a system controlling some thirty-six hundred miles of road, made up by the consolidation and leasing of many different railroads, upon nearly every one of which there existed one or more mortgages. The company was insolvent, its preferential indebtedness amounted to nearly four and one-half millions, its credit was gone, and many parts of the property were in a wretched condition. The bill was obviously framed upon the theory that an insolvent railroad corporation has a standing in a court of equity to surrender its property into the custody of the court, to be preserved and disposed of according to the rights of its various creditors, and, in the meantime, operated in the public interest. The relief sought was predicated upon the view that those rights were not changed by the application, and that the proceeding was in the interest of each and all of them as such interest might appear. The bill is characterized by one of the counsel as "without precedent." We are not called upon to inquire as

to how that may be, but we readily agree that the concession to a mortgagor company of the power through its own act to displace vested liens by unsecured claims is dangerous in the extreme. But no such concession was made here. On the contrary, from the beginning, the court, by repeated directions and orders, fully recognized the fact that none of the numerous defendants had consented that their rights, whatever they might be, should be subordinated to those of others to which they were superior, and that no defendant should be subjected to loss of priority because necessarily brought into association with others by the bill.

In the order of appointment, the receivers were directed to pay out of the income that should come into their hands rental which had accrued or which might accrue upon all complainant's leased lines, but to keep accounts showing the source of income and revenue with reference to expenditure. Immediately, and within a month thereafter, the receivers called the attention of the court to the fact that the earnings of ten enumerated lines or divisions had not at any time since their acquisition been sufficient to pay their operating expenses, the cost of their maintenance and interest on the bonds and other obligations secured upon each of them, while certain others had; and by the confirmation of the master's report, which was made on the 28th of June, 1884, the court, adopting its recommendations, directed that the receivers should pay interest on the bonds or obligations secured on the several paying enumerated lines or divisions, from whatever balance of income might remain in their hands after meeting other obligations; and that an account should be kept of the earnings and incomes from, as well as the accounts of all the operating expenses, cost of maintenance and taxes upon, certain other enumerated lines or divisions, including that of the petitioner. This was followed by the declaration of the court that the earnings of the branches which earned their interest were not to be taken to pay interest on non-earning branches, but that the concerns which had not earned running expenses would be permitted to collapse. Then came the intervening petition of the appellant company for a transfer of the lease,

which petition was granted; but the order of court was not availed of or acted upon by petitioner.

The order of April 16, 1885, reiterated the position taken by the court, and specifically pointed out that where there was no income, rental claims would not be paid.

The petitioners, however, after taking possession of their road, asked the court to decree, not the allowance of their rental claims, and those for repairs, and taxes paid, as unsecured indebtedness, but a lien in their favor for those amounts superior and paramount to the mortgages on the property of the Wabash Company. They sought, in other words, to have these claims charged upon the corpus of the property in preference to subsisting contract liens. And they based this contention upon the proposition that the receivers had adopted the lease and made themselves, and the property in their hands, liable according to its terms.

It is not asserted that these receivers became the assignees of the unexpired term of the leasehold estate with the right to dispose of it, but it is claimed that because they took possession of the railroad of the Quincy Company and held and operated it until August 1, 1885, they became liable to the extent of the rental up to that time. But the receivers were not statutory receivers, nor did they occupy identically the same position as assignees in bankruptcy or insolvency, and the like. They were ministerial officers appointed by the Court of Chancery to take possession of and preserve *pendente lite* the fund or property in litigation; mere custodians, coming within the rule stated in *Chicago Union Bank* v. *Kansas City Bank*, 136 U. S. 223, 236, where this court said: "A receiver derives his authority from the act of the court appointing him, and not from the act of the parties at whose suggestion or by whose consent he is appointed; and the utmost effect of his appointment is to put the property from that time into his custody as an officer of the court, for the benefit of the party ultimately proved to be entitled, but not to change the title, or even the right of possession in the property."

As observed in relation to such a receiver, by the Supreme

Court of Maryland, in *Gaither* v. *Stockbridge*, 67 Maryland, 222, 224, cited by counsel for appellee: "It is manifest that the scope of his duties and powers are very much more restricted than those of an assignee in bankruptcy or insolvency. In the case of an assignee in bankruptcy, the law casts upon such assignee the legal title to the unexpired term of the lease, and he thus becomes assignee of the term by operation of law, unless, from prudential considerations, he elects to reject the term as being without benefit to the creditors. But not so in the case of receivers, unless it be, as in New York, and some of the other States, where, by statute, a certain class of receivers are invested with the insolvent's estate, and with powers very similar to those vested in an assignee in bankruptcy. *Booth* v. *Clark*, 17 How. 331. The ordinary chancery receiver, such as we have in this case, is clothed with no estate in the property, but is a mere custodian of it for the court; and, by special authority, may become an officer of the court to effect a sale of the property, if that be deemed necessary for the benefit of the parties concerned. If the order of the court, under which the receiver acts, embraces the leasehold estate, it becomes his duty, of course, to take possession of it. But he does not, by taking such possession, become assignee of the term, in any proper sense of the word. He holds that, as he would hold any other personal property involved, for and as the hand of the court, and not as assignee of the term."

But appellants insist that without regard to privity of estate or privity of contract, receivers in chancery are liable, not for a reasonable rental value during the occupancy of leased property committed to their charge by order of court, but for rental according to the covenants of the leases whenever there are unequivocal acts of use and control of such property; and that they thus adopt the leases and become bound by their terms so long as such use and control continue. It is said that this is settled doctrine, and that whether receivers take as statutory or common law or *quasi* or equitable assignees; whether the title is in them, or the estate, or the whole estate, has vested in them, or whether they hold as

mere custodians for the court, is immaterial; that they are put to an election to assume or to reject the leases, and if they elect to avail themselves of them, they are bound to respond according to their terms. This position ignores any distinction between those who take by operation of law and those who do not, but inasmuch as it confessedly requires the application of the same rule as in the case of statutory receivers, assignees, and liquidators, this branch of the controversy may be disposed of on appellants' own ground.

That rule is thus stated in Mr. Platt's work on Leases, (vol. 2, p. 435,) in reference to assignees in bankruptcy: "A reasonable time was allowed the assignees to ascertain the value of the lease before they made their election; for which purpose they might have it valued, or put up for sale, without danger of such act being deemed an acceptance. If, however, they accepted a bidding, or dealt with the estate as their own, or used it in a manner injurious to the persons otherwise entitled, they were not within this protection." The principle that such assignees shall not be held, unless by their consent, to take what will charge the estate with a burden, has been often applied by this court; *Glenny* v. *Langdon*, 98 U. S. 20; *American File Co.* v. *Garrett*, 110 U. S. 288; *Sparhawk* v. *Yerkes*, 142 U. S. 1; and also by the state courts, as in *Martin* v. *Black*, 9 Paige, 641, by Chancellor Walworth; in *Commonwealth* v. *Franklin Insurance Co.*, 115 Mass. 278, by Judge Endicott; in *Berry* v. *Gillis*, 17 N. H. 9, by Chief Justice Parker; and in many other cases.

It is thus expounded in respect of official liquidators under the English "Companies Act," by Lord Justice Lindley, in *In re Oak Pits Colliery Co.*, 21 Ch. D. 322, 330:

"(1) If the liquidator has retained possession for the purposes of the winding up, or if he has used the property for carrying on the company's business, or has kept the property in order to sell it or to do the best he can with it, the landlord will be allowed to distrain for rent which has become due since the winding up. . . . (2) But if he has kept possession by arrangement with the landlord and for his benefit as well as for the benefit of the company, and there is no agree-

ment with the liquidator that he shall pay rent, the landlord is not allowed to distrain. . . . When the liquidator retains the property for the purpose of advantageously disposing of it, or when he continues to use it, the rent of it ought to be regarded as a debt contracted for the purpose of winding up the company, and ought to be paid in full like any other debt or expense properly incurred by the liquidator for the same purpose, and in such a case it appears to us that the rent for the whole period during which the property is so retained or used ought to be paid in full without reference to the amount which could be realized by a distress. . . . But no authority has yet gone the length of deciding that a landlord is entitled to distrain for or be paid in full rent accruing since the commencement of the winding up, where the liquidator has done nothing except abstain from trying to get rid of the property which the company holds as lessee. If the landlord had endeavored to reënter and the liquidator had objected, the case might be different, but having regard to the provisions of the Companies Act of 1862, we are of opinion that in the case now supposed the landlord must rely on his right, if any, to reënter and prove for the arrears due to him, and that he is not entitled to anything more."

In *Sunflower Oil Company* v. *Wilson*, 142 U. S. 313, 322, where an oil company contracted with a railway company to purchase certain rolling stock and lease the same to the railway company at a specified rental, the latter agreeing to purchase and pay for it in cash on or before a given date, or if it should be unable to do so to turn it over to the oil company at the expiration of the contract in good order and condition, and the railway company became insolvent and its mortgage bondholders instituted proceedings to foreclose and had a receiver appointed, it was said: "The receiver did not simply by virtue of his appointment become liable upon the covenants and agreements of the railway company. High on Receivers, § 273; *Hoyt* v. *Stoddard*, 2 Allen, 442. Upon taking possession of the property, he was entitled to a reasonable time to elect whether he would adopt this contract and make it his own, or whether he would insist upon the inability

of the company to pay, and return the property in good order and condition, paying, of course, the stipulated rental for it so long as he used it." As between the mortgagees invoking the interposition of the court and the oil company, the agreed rental was held to be the proper payment to be made for the use of the rolling stock under the particular contract in question.

Tested by this rule, we are of opinion that these receivers did not become bound by an election or by reason of any act of their own or by any order of the court.

The court did not bind itself or its receivers *eo instanti* by the mere act of taking possession. Reasonable time had necessarily to be taken to ascertain the situation of affairs. The Quincy Company, as a *quasi* public corporation, operating a public highway, was under a public duty to keep up and maintain its railroad as a going concern, as was the Wabash Company under the contract between them, but the latter had become unable to perform the public service for which it had been endowed with its faculties and franchises, and which it had assumed to discharge as between it and the other company. Its operation could only be continued under the receivers, whose action in that respect cannot be adjudged to have been dictated by the idea of keeping the property in order to sell it, or using it to the advantage of the creditors, or doing otherwise than "abstain from trying to get rid of the property." Clearly this was no case of the employment of the property of another for one's own benefit. Within a month the receivers applied to the court for instructions, distinctly setting forth that there was no income wherewith to pay the rental in question, and the order of court, entered at once, proceeded upon the theory that they were not to be bound by the rental prescribed.

Nor was there any resistance by the receivers or impediment interposed by them to the reëntry of the Quincy Company. The receivers did not so remain in possession, nor were they authorized by the court to so remain, as to render the lessor unable itself to resume possession. The lease gave the Quincy Company the option to reënter, and put an end to it, upon de-

fault in payment of rental continued for thirty days. Default in fact did not occur until July 1, 1884, but upon the face of the bill the utter inability of the Wabash Company to pay rent appeared, and under the circumstances it is unreasonable to suppose that if appellants had applied to the Circuit Court for possession of the property earlier than they did, the court, in view of the state of case disclosed by the record, would have declined to hand it over. Such application was made December 16, 1884, and an order granted accordingly, but not availed of by the Quincy Company. Subsequently, on a renewed application, the company retook its road, freed from any liability for the enormous preferential indebtedness of the Wabash Company, and with its public duty discharged up to that time by the receivers at a loss of more than $20,000. The lease had not theretofore been cancelled by the court, doubtless because it was considered that that ought not to be done without the assent of the lessor, but the court said: "The right of a lessor or mortgagee, whose rent or interest is unpaid, to insist upon possession or foreclosure will be promptly recognized." This was as late as April 16, 1885, but it was consistent with the order of June 28, 1884, and the position of the court throughout. Indeed, there can be no pretence that the Quincy Company or its trustees were encouraged to remain inactive in reliance on payment of rental under order of court unless the earnings of their road justified it.

Our conclusion is that the receivers, as such, did not become so committed to the terms of the lease as by reason thereof to be subjected to an obligation requiring the rental to be paid out of the property of the Wabash Company in preference to the payment of the mortgagees of that property. Whether that rental might be preferred in payment to the unsecured debts if there had been any equity in the mortgaged premises, is a question not arising for decision.

If the receivers were not bound as having become virtually assignees of the lease or by reason of any acts of their own or orders of the court, were the petitioners entitled to the relief they prayed upon any ground heretofore recognized as justify-

ing such imposition upon the corpus of the property in priority to the claims of lien creditors ?

In *Morgan's Company* v. *Texas Central Railway*, 137 U. S. 171, 197, we said that the doctrine of *Fosdick* v. *Schall*, 99 U. S. 235, is : " That a court of equity may make it a condition of the issue of an order for the appointment of a receiver, that certain outstanding debts of the company shall be paid from the income that may. be collected by the receiver or from the proceeds of sales ; that the property being in the hands of the court for administration as a trust fund for the payment of incumbrances, the court, in putting it in condition for sale, may, if needed, recognize the claims of material men and laborers, and some few others of similar nature, accruing for a brief period prior to its intervention, where current earnings have been used by the company to pay mortgage debt or improve the property, instead of to pay current expenses, under circumstances raising an equity, for their restoration ; as for instance where the company being insolvent and in default is allowed by the mortgage bondholders to remain in possession and operate the road long after that default has become notorious, or where the company has been suddenly deprived of the control of its property, and the pursuit of any other course might lead to cessation of operation. *Miltenberger* v. *Logansport Railway Co.*, 106 U. S. 286, 311, 312. If the officers of the company, remarked Mr. Chief Justice Waite, in *Fosdick* v. *Schall*, ' give to one class of creditors that which properly belongs to another, the court may, upon an adjustment of the accounts, so use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights. . . . Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that if there has been in reality no diversion there can be no restoration; and that the amount of restoration shall be made to depend upon the amount of diversion.' *Burnham* v. *Bowen*, 111 U. S. 776 ; *Union Trust Co.* v. *Illinois Midland Co.*, 117 U. S. 434."

The immense floating debt for supplies and other prefer

ential claims here precludes the inference that there was any such diversion of earnings applicable to the payment of rental, and the priority asked cannot be rested on that ground.

In *Wallace* v. *Loomis*, 97 U. S. 146, 162, it was said by Mr. Justice Bradley, speaking for the court: " The power of a court of equity to appoint managing receivers of such property as a railroad, when taken under its charge as a trust fund for the payment of incumbrances, and to authorize such receivers to raise money necessary for the preservation and management of the property, and make the same chargeable as a lien thereon for its repayment, cannot, at this day, be seriously disputed. It is a part of that jurisdiction, always exercised by the court, by which it is its duty to protect and preserve the trust funds in its hands. It is, undoubtedly, a power to be exercised with great caution; and, if possible, with the consent or acquiescence of the parties interested in the fund."

But here this rental was certainly not an expense originated in the process of administration by the court, and the road was surrendered as soon as the lessor would take it. Nor did the mortgagees consent to have the claim charged upon the corpus of the property in preference to their mortgages. The case does not come within *Kneeland* v. *American Loan and Trust Co.*, 136 U. S. 89; *Miltenberger* v. *Logansport Railway Co.*, 106 U. S. 286, 313; or any other of the authorities cited.

We do not discover any equitable ground upon which appellants are entitled to a preference in the distribution of the proceeds of the sale of the mortgaged property. The cost of the maintenance of the Quincy road by the receivers exceeded its total earnings; and the net earnings of the whole Wabash system, before the Quincy Company retook its road, did not amount to one-quarter of the amount of preferred debt existing when the receivers were appointed. The property was surrendered to it freed from any charge for that debt, to the payment of which it contributed nothing. The action of the court in making the appointment of receivers on the application of the mortgagor cannot be successfully challenged

upon this appeal. The theory of the bill and the action of the court and its officers left all the creditors with their rights existing as they existed before the appointment was made; and we find no legal or equitable grounds upon which the prior liens of the mortgagees can be displaced.

The decree of the Circuit Court dismissing these petitions was right, and it is

*Affirmed.*