GARDNER v. GLEASON et al.

(Circuit Court of Appeals, First Circuit. June 18, 1919.)

No. 1386.

1. BANKRUPTCY ⊕227—REFEREE—PETITION TO REVIEW.
   Under General Order in Bankruptcy No. 17 (89 Fed. viii, 32 C. C. A. xix), it is the duty of a referee, where petition to review his order is filed, to forthwith certify to the judge the question presented, a summary of the evidence relating thereto, and the finding and order of the referee thereon.

2. BANKRUPTCY ⊕467—APPEAL—QUESTION PRESENTED FOR REVIEW.
   On appeal by the trustee in bankruptcy from a decree of the Circuit Court, reversing an order of the referee as to the rent to be paid by the receivers for the use of property of which the bankrupt had possession, *held* that, under the assignments of error and the certification of the question for review by the referee, the only question for determination on appeal was the amount of rent which should be allowed the owners during the occupancy of the receivers, etc.

3. BANKRUPTCY ⊕255—CLAIMS—RENT.
   Neither the rent reserved in the lease, nor the rent which had been previously paid by the bankrupt as a tenant at will, are conclusive in determining what rental should be allowed the owners during the occupancy of their premises by the receivers; but evidence of the rent which had been previously paid, either under the lease or a verbal letting, may be of great assistance in determining what fairly and equitably ought to be allowed.

4. BANKRUPTCY ⊕255—EXPENSES OF PRESERVATION OF ESTATE—ALLOWANCE OF RENT.
   Where occupancy by the assignee of a bankrupt was of benefit to the estate, as the business was maintained as a going concern, rent for such occupancy should be allowed as one of the expenses in preserving the estate.

5. BANKRUPTCY ⊕255—CLAIMS—RENT.
   Where, after bankruptcy, receivers retained possession of the premises in which the bankrupt was carrying on business, for the purpose of disposing of the estate, *held*, that the amount of business transacted by the receivers could not be considered in determining the amount of rent to which the owners of the premises were entitled.

6. BANKRUPTCY ⊕255—ALLOWANCE OF RENT TO OWNERS OF BUILDING.
   The decree of the District Court, allowing the owners of property occupied by receivers in bankruptcy, who carried on the bankrupt's business, to recover for the period of occupancy at the same rate of rental as fixed under the lease, *held*, under the circumstances, warranted.

   Anderson, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

---

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In the matter of the bankruptcy of the Crawford-Plummer Company. An order of the referee, fixing allowance of rent in favor of Albert A. Gleason and others, trustees, was reversed by the District Court (253 Fed. 76), and Charles G. Gardner, trustee in bankruptcy, appeals. Affirmed.

Asa P. French, of Boston, Mass., for appellant.

John J. Higgins, of Boston, Mass., for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. This is an appeal from a decree of the District Court of Massachusetts vacating an order of the referee and determining the rent to be paid to the owners of a building on Washington street, in the city of Boston, during its occupation by a common law assignee and receivers in bankruptcy. The assignee occupied from April 18, 1916, to May 3, 1916, and the receivers from the latter date to July 31, 1916; so that the occupancy by both was for 3⅖ months.

The premises were leased in December, 1905, for a term of 10 years from January 1, 1907, to the George F. Quigley Company, a corporation of which Andrew Crawford was the treasurer, and this company had occupied the premises until 1909, when the bankrupt, the Crawford-Plummer Company, a corporation, of which the same Andrew Crawford was treasurer, took over its business and the possession of the premises, and paid rent to the owners in accordance with the terms of the lease. The record does not disclose any assignment of the lease to the bankrupt, nor any subletting to the bankrupt, nor any surrender of the lease and a verbal letting by the owners to the bankrupt, but does disclose that the bankrupt was in possession of the premises from some time in 1909 to April 18, 1916, and paid rent to the owners in accordance with the terms of the lease.

It appears from the summary of testimony before the referee that one of the representatives of the owners wrote to one of the receivers two days after their appointment, stating in substance that he had been informed that he and another had been appointed receivers of the Crawford-Plummer Company, and also:

"We would like to know what your plans are in regard to occupying the property."

To this the receivers replied that they expected to continue the business of the Crawford-Plummer Company in the Boston store, but did not know how long it would be advisable to continue the business as receivers, and that, if an arrangement could be made for new leases of the property, allowing them a reasonable time to vacate, it might be arranged to their advantage and that of the landlord. At this time it was evident that the receivers thought that the Crawford-Plummer Company were lessees of the property, because they state that, if they vacate the property, it would be—

"upon some arrangement disposing of the remaining portion of the term of the Crawford-Plummer Company's lease, and any proposition looking toward the surrender of possession of the Boston store and the purchase of the unex-

pired portion of the Crawford-Plummer Company lease would be carefully investigated by us, and, if it seems to the advantage of the estate, we will at once seek the permission of the court to take advantage of the offer."

On May 16, 1916, Mr. Albert A. Gleason, with a Mr. Reid, both representing the owners of the premises, called upon one of the receivers to inquire their intentions in regard to remaining in occupancy of the premises and the rental to be paid, and, finding that they intended to remain for the present, Mr. Gleason told him the rental was $20,000 a year and taxes and repairs; that the taxes for 1915 were about $6,390 and said:

"If you remain in the premises we shall expect you to pay the same rental that the tenant paid."

To which the receiver replied:

"That he thought it was customary in such cases for the receivers to pay the same rental as had been paid by the tenant."

Mr. Gleason afterwards called upon the other receiver and gave him the same information in regard to the rental that had been paid by the bankrupt, and told him:

"That he thought that the fair value of the premises would be at the same rate that the tenant had paid."

Neither of the receivers was informed, however, in regard to the relationship of Crawford with the Quigley Company or the Crawford-Plummer Company. Although there was other correspondence between the representatives of the owners and the receivers, no agreement was made in regard to rental; but the receivers paid them $3,000 on account of the rent, stating that the balance would be left for future adjustment. The rental reserved in the lease was $20,000 per annum and all water rates and taxes which might be assessed upon the premises during the term and the cost of necessary repairs. The taxes for the year 1915 were $6,393, water rates during the occupancy by the assignee and receivers $30, and repairs $27.

The learned referee found that the reasonable rental value of the premises during the occupancy of the assignee and receivers was greater for a term of years than that reserved in the lease, but that for a temporary occupancy their rent might be as low as $100 per week. This finding, however, in regard to the value of the rental for temporary occupancy, was based upon the testimony of a real estate agent who had charge of the property, and who, after consultation with the owners, made an arrangement with the purchaser at auction of the balance of the goods which the receivers had been unable to sell, by which the purchaser might remain upon the premises, for the purpose of getting rid of the goods which he had bought, for a rental of $100 per week, which the agent said was the "usual price under such circumstances."

The agent, at the request of one of the guarantors on the lease, placed "To Let" signs upon the store before the occupancy by the assignee, and testified that he had received no satisfactory proposition to lease the premises down to the date of sale, and he testified:

"I understood, of course, that while the 'To Let' sign was in the window,. the occupants were merely tenants at sufferance, and that they were to remain only unless or until the owners got a satisfactory offer to rent the premises by lease."

There was no evidence that any such agreement had been made by the owners and the receivers, and the referee's finding, that it was. understood that the receivers were to vacate the premises whenever a. satisfactory offer to rent or lease was received by the petitioners, is. only his conclusion from the above testimony. The referee has found that the assignee and receivers carried on the business in the store, and that it was of advantage to the bankrupt estate that the business be continued in the store which the bankrupt had occupied. He certified. that, under all the circumstances, $1,500. a month, including water and repairs, seemed to him equitable and just rental for the premises, and that rent for 3⅖ months at this rate would amount to $5,110, and, deducting the amount already paid by the receivers on account, he found the balance to be $2,100, and ordered that sum to be paid.

[1, 2] Both the receivers and the owners of the premises petitioned the court to review this order of the referee, and it then became the duty of the referee, under General Order in Bankruptcy No. 17 (89 Fed. viii, 32 C. C. A. xix), to—

"forthwith certify to the judge the question presented, a summary of the evi-dence relating thereto and the finding and order of the referee thereon."

The only question certified by the referee was:

"What should be allowed for the rent of the premises occupied by the as-signee and receivers from April 18, 1916, to and including August 1, 1916?"

And with this question he certified, as provided by the above general order, a summary of the evidence taken before him relating to the question which was presented.

The receivers, in their petition for review, assigned as the only rea-son for review that the order of the referee "was and is erroneous, in that said amount allowed is excessive."

There was, therefore, only one question presented to the learned judge of the District Court, and that related solely to the amount which should be allowed the owners as rent during the occupancy of the premises by the assignee and receivers. No other question is raised by the assignment of errors on this appeal. While it is true that the trustee has assigned as error "that the court erred in treating the case substantially as if it were one in which the bankrupt had held directly under the petitioners' lease," upon reference to the opinion of the court, however, it appears that he stated that "for the purposes of the present question, I think the case substantially the same as if the bank-rupt had held directly under the lease"; the question being only the determination of the amount of rent which should be allowed. It does not appear from the certificate of the referee, or from the testimony which was filed with the court, or from the record of the case sub-mitted to us on appeal, that the right of the owners to receive whatever rent should be allowed by the court was questioned.

In the argument of the case before us, however, the trustee under-

took to question this right, and claimed that, as there was an outstanding lease running from the owners of the property to the George F. Quigley Company, the Crawford-Plummer Company was a subtenant at will of the George F. Quigley Company, and that until the expiration of the lease, or until some default creating a right to re-enter and take possession of the premises by the owners, the latter had no claim for rent, except against the Quigley Company. We do not regard this question as now open to the trustee, but that the sole question before us is what sum should be allowed.

The learned District Judge found the yearly rent to be $26,420, which evidently included $20,000 cash rental, taxes $6,393, and repairs $27. He thought that the referee had overemphasized the element of uncertainty in the tenancy of the assignee and receivers, as no pressure to vacate was ever put upon them by the owners or by the lessee, and that reasonable compensation should be paid for use and occupancy of the premises; that the rent reserved in the lease to the bankrupt was a fair measure of what the use and occupancy was fairly worth; that in the absence of an express agreement for a lower rental there is a presumption in favor of that sum; and that it will ordinarily be allowed, unless unusual circumstances appear making it plainly unreasonable. He also found there were no such circumstances in this case and that the ordinary practice ought to have been followed, and that the fact that the rent was large in comparison with the business carried on was a matter with which the owners were not concerned, and which ought not to diminish their rights, and ordered that the sum of $4,485.65 be paid to the petitioners. This sum was arrived at by adding to the cash rental of $20,000, paid under the lease, taxes for the year 1915, $6,393, and repairs amounting to $27, making the total yearly rental $26,420, or $2,201.66 per month, and the rental for 3⅖ months, the period of the occupancy by the assignee and receivers, $7,485.65, from which $3,000 paid by the receivers was deducted.

[3] We do not think the rental reserved in the lease, nor the rent which had been previously paid by the bankrupt as a tenant at will, are conclusive in determining what rental should be allowed the owners during the occupancy of their premises, for the preservation of the estate of the bankrupt; but evidence of the rent which had been previously paid, either under the lease or a verbal letting, may be of great assistance in determining what fairly and equitably ought to be allowed by the court to the owner as just compensation for such occupation. It was held in Fleming v. Noble, 250 Fed. 733, 163 C. C. A. 65, that where the rental reserved in the lease is a fair rental value of the premises occupied by the receiver, that should be awarded to the owner of the premises for the forced occupation of his premises, in the absence of any evidence of any agreement that a lower rental was agreed upon.

[4] The referee has found that occupancy by the assignee was of benefit to the estate, as the business of the bankrupt was maintained as a going business, and rent for such occupancy should be allowed as one of the expenses in preserving the estate. Randolph v. Scruggs,

190 U. S. 533, 538, 23 Sup. Ct. 710, 47 L. Ed. 1165; Remington on Bankruptcy, vol. 1, p. 986.

[5] We do not think there was an error in the failure of the court below to treat as immaterial the amount of business done. If the premises occupied were too large for the business which was transacted, this was a matter to be determined by the receivers; and if they chose to occupy the whole of the premises without making any arrangement in regard to a lower rent, we do not think the rent should be made dependent upon their success, and see no reason why, if the sales were small, the landlord should not, on this account, be entitled to a fair rental for his premises.

In Kneeland v. American Loan & Trust Co., 136 U. S. 89, 103, 10 Sup. Ct. 950, 955 (34 L. Ed. 379), the court said that the receiver was liable for payment of a reasonable rental during his occupancy:

"A rental not based on the use actuallly made by the receiver, but on the ordinary value of such property. * * * Such value is not to be determined by the amount of actual use, but by what, in the first instance and before the use had been had, would be adjudged a reasonable rental value."

[6] It would be most inequitable to interpret the agreement, made in the interest of the bankrupt estate to assist the receivers in obtaining as large a price as possible for the balance of the goods, as an admission that it was a fair rental value of the premises, while the assignee and receivers were conducting the business of the bankrupt. The fact that the receivers had already paid $3,000 on account of rent and wished to leave the balance for future adjustment conclusively proves that in their opinion the rent which it was agreed should be paid by the purchaser of a small remnant of the goods was not a fair measure of the reasonable rental during their occupancy. Although a "To Let" was placed upon the property some time in the early summer, the receivers were allowed to remain in possession of the premises as long as they desired, and interference with their possession would have been enjoined unless, upon application by the owners to the bankruptcy court, it should have ordered the receivers to vacate the premises. Under the order of the court they carried on the business in which the bankrupt had been engaged. They knew the rental which had been paid by the bankrupt, and that the owners expected them to pay the same rental during their occupancy, and did not surrender any part of the premises, nor make any arrangement to pay a lower rental.

We think that, where the rental which had been previously paid by the bankrupt, either under the terms of the lease or under a tenancy at will, is the fair rental value of the premises, the court, under all equitable considerations, ought to award this rental to the owner of the premises which are occupied for the preservation of a bankrupt estate, in the absence of any agreement for a lower rental or circumstances of an unusual nature that would render it inequitable, and we do not think there are such circumstances in this case.

The order and decree of the District Court is affirmed, with costs to the appellees.

ANDERSON, Circuit Judge (dissenting). From both the opinion and the conclusion of the majority I am compelled to dissent. The result reached amounts to turning over the sum of $4,485.65, which, in my view, belongs to the general creditors of the bankrupt, to or for the benefit of Crawford, the bankrupt's treasurer, and Shea, the other guarantor of the lease.

The facts really controlling in the case seem to me to be disregarded in the opinion of the majority.

The owners of this building, trustees under wills, made a 10-year lease, ending December 31, 1916, to the George F. Quigley Company, of which Andrew Crawford was treasurer. Crawford and one Shea, both, so far as this record indicates, financially responsible, guaranteed performance by the lessee of all its covenants in the lease. The lessors were further secured by a $10,000 surety company bond. The original lessee went out of business in 1909. The Crawford-Plummer Company, now the bankrupt, succeeded to the business, and Crawford became its treasurer. The new company occupied the premises, and Crawford, apparently as treasurer of the new company, continued to pay the rent. As long as the landlords received their rent promptly and were not asked to release any of their rights under their old, well-secured lease, they were naturally content. As trustees under wills they were in duty bound to maintain all the legal rights of their estates. In their petition they have not alleged, nor is it now contended by them in argument, that the bankrupt was ever their tenant. The petition shows, as does the evidence, and as the District Court found, that the bankrupt occupied the premises as a tenant at will of the George F. Quigley Company. The petitioners stand, and properly, upon their rights, under the lease to the Quigley Company. There is nothing in the record warranting the inference that these owners have not long ago collected the full amount of the rent due under this lease. It was their duty to collect it.

It follows that whatever is received out of the bankrupt estate goes, not to benefit the owners, these petitioners, but to exonerate Crawford and Shea from liability otherwise accruing under their guarantee. They are the real parties in interest. The bankruptcy of the tenant at will of the lessee had, and could have, no effect whatever on the lessors' rights under their lease. There never was any privity between the owners and the bankrupt, or between the owners and the receivers.

When the Crawford-Plummer Company failed in April, 1916, the receivers at first assumed, not unnaturally, that the bankrupt was the lessee, and that consequently it was their duty within a reasonable time to elect whether to accept or renounce the lease. Bell v. American Protective League, 163 Mass. 558, 40 N. E. 857, 28 L. R. A. 452, 47 Am. St. Rep. 481; Railroad Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, 36 L. Ed. 632; In re Sherwoods, 210 Fed. 754, 757, 127 C. C. A. 304; Fleming v. Noble, 250 Fed. 733, 163 C. C. A. 65. Before they ascertained the real facts, $3,000 had been paid by the receivers to the petitioners. But all the negotiations between the receivers and the owners, as well as this payment, were grounded on a misapprehension of the legally significant facts. I am compelled to regard these negotia-

tions, treated by the majority as of great, perhaps controlling, importance, as having nothing whatever to do with the real case.

As there was no leasehold which the receivers could accept or renounce, no question arises as to whether, pending decision, the rent reserved in the lease, or only a reasonable rent, should be allowed. Bell v. Am. Prot. League, supra; Fleming v. Noble, 250 Fed. 733, 735, 163 C. C. A. 65. The receivers had nothing to accept or to renounce. They were probably, as the referee and the District Court found, tenants at sufferance of the George F. Quigley Company. As there was no privity between the petitioners and the receivers, the petition should in my view on that ground alone be dismissed, even if from the bankruptcy estate further payments ought to be made for the use and occupation of the premises.

But the majority opinion holds that this issue is not open, that the point of no privity was raised too late by the receivers, and that the only question certified by the referee was "what should be allowed for the rent of the premises occupied by the assignee and receivers from April 18, 1916, to and including August 1, 1916."

As a matter of merely technical construction, to determine "what should be allowed" leaves it open to determine whether anything should be allowed. But even if there were, as I think there are not, technical difficulties in dealing with this case on its real merits, this court ought not, in my view, to give its approval to an obvious misapplication of a substantial part of this bankruptcy estate.

As already indicated, the petition of the owners was demurrable. The proceedings before the referee and before the District Court were, in effect, a mistrial. Undoubtedly counsel for the receivers was late in grasping the real situation and discovering that there was no warrant for making any payment to these petitioners. But the petitioners certainly have not been harmed by this belated ascertainment of the real facts. It is far from clear that they did not cause, or at any rate contribute to, the error and confusion. However that may be, the error below is now clearly apparent on the record. The issue is before this court. The responsibility must be taken by this court. The petitioners had, and have, no standing to claim anything from this bankruptcy estate.

But if we assume that by amendment the Quigley Company could be substituted for the petitioners, and that the question is broadly open as to what may justly and legally be allowed any party entitled thereto for the use of these premises, I think the result is the same; nothing is justly or legally due. $3,000 has already been paid for this occupancy of 15 weeks—$200 a week. The amount of the business done was about $40,000. To charge upon a bankruptcy estate a rent of about $7,500 for the sale of $40,000 of goods is obviously maladministration for which some one must be responsible. "Res ipsa loquitur." While the receivers were rather lax and careless, I do not think they can, on this record, be held responsible for such a waste of assets.

The referee found, and his finding is sustained by the District Court, that—

"The rental value of the premises used only for temporary occupancy was perhaps as low as $100 a week. The receivers were tenants at sufferance, and it was understood that they were to vacate the premises whenever a satisfactory offer to rent by lease was received by the petitioners. * * * There was no agreement between the assignee and the owners, or between the receivers and the owners, or between the trustees and the owners, with reference to the amount of rent to be paid."

As the receivers did not undertake to agree for the payment of any such disproportionate rent, it is unnecessary to consider whether any such agreement, if made, could have, without the approval of the court, legally bound their estate.

Reasonable compensation for such temporary use and occupancy obviously depends upon the benefit to the occupant, or upon the sacrifice of the owners, or upon the combination or balancing of both factors. I think it clear that $100 a week fairly measured the sacrifice of the owners, including under that name the Quigley Company and Crawford and Shea, the guarantors of the lease; for it was as much as they could have gotten from any other occupant. I do not regard Redmond's announcement, who apparently acted for all parties in interest, that the purchaser might remain in possession after August 1 at a rental of $100 a week, as anything other than a business proceeding on the part of the persons who had these premises in the market to let. It was not a piece of philanthropy. It was an ordinary, businesslike attempt to get what they could out of the premises under very disadvantageous circumstances. It fairly tests the value of temporary use of the premises to would-be lessors, at that time and under the existing conditions. In all probability the premises would have been vacant until the end of the term on December 31, 1916, except for the occupancy of the receiver, and of the purchaser of the goods.

If, then, failing occupancy by these receivers, the premises would not have produced more than $100 a week—or even the $200 a week already paid to the owners, then the question of any further compensation for use and occupancy must be determined, at least in large part, by considering the value of the premises to the occupants. Such value obviously cannot be determined without paying some regard to the amount of business done upon the premises. It was, therefore, I think error for the court below to treat the amount of business done upon the premises as immaterial. As already indicated, premises used for the sale of $40,000 of goods cannot be of more than $3,000 benefit to a bankruptcy estate. The estate made no profit from the use of these premises to which the petitioners are justly entitled.

Otherwise stated, the owners of these premises were fairly entitled to receive from the bankruptcy estate, either what they could have gotten from some other occupant, or else the value of the premises to the bankrupt estate. They were entitled to nothing more. The fact that under a long lease with a going business the premises would have produced a rent largely in excess of the value for temporary occupancy is, while entitled to consideration, a fact of little—almost no—weight in the determination of the present problem.

Nor is there anything either in the decision or in the opinion in

Kneeland v. American Loan & Trust Co., 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379, inconsistent with the view I now urge. That case arose out of foreclosure of a railroad mortgage and involved conflicting liens upon realty and personalty. The language quoted by the majority has absolutely no application to such a situation as is presented in this case.

Of course, rent reserved in a lease is evidence of a fair rental; sometimes and under some circumstances, almost conclusive of what is a fair rental; at other times, and under such circumstances as obtain in this case, of almost no weight.

There is another point on which I have the misfortune to differ from my Brethren. They refer to this occupation as a "forced occupation" —as though the Bankruptcy Court had power, and had used that power, to compel the owners or other persons legally entitled to the possession of the estate to turn it over for the use of the court's receivers. As I have already indicated, I think the facts in this case show clearly that the actual occupancy was with the assent of the parties legally entitled to possession and with an understanding that the receivers would move whenever a new tenant could be found.

But I am unwilling, even by implication, to assent to the doctrine that a court of equity or bankruptcy has power to requisition either real or personal property of third persons for use in liquidating bankruptcy assets. An equity court has no power of eminent domain, or anything analogous thereto. Of course private property may be appropriated to public use, reasonable compensation being paid therefor. The use of premises as a place of sale of bankruptcy assets is not a public use. No one would seriously contend that, however advantageous in the administration of bankruptcy assets, the court could compel one of our great department stores to give up a desirable part thereof for the sale of such assets. The fact that such assets, when seized by the court's receivers, are frequently located on premises in which the bankrupt has no continuing legal right, does not alter the nature of the problem. The owner of such premises has the same legal right to repossess himself of his property as has the owner of a department store to withhold the use of his premises. I can find no case decided by the Supreme Court of the United States, or by any other court of last resort, in which any such power has been sustained.

When there is a leasehold estate, it may or may not be the duty of the court's receiver to adopt it as an asset. Reasonable time for making such decision is a necessity of the situation. Pending such decision, if the receiver actually occupies, reasonable rent, or the rent reserved, must be paid. Bell v. American Protective League, 163 Mass. 558, 40 N. E. 857, 28 L. R. A. 452, 47 Am. St. Rep. 481; Fleming v. Noble, supra, and cases cited. If the lease is accepted, full rent is paid out of the estate. If the lease is renounced, the rights of the landlord against the original lessees are, as to subsequently accruing rent, unaffected. In re Sherwoods, 210 Fed. 755, 127 C. C. A. 304; In re Roth & Appel, 181 Fed. 667, 104 C. C. A. 649, 31 L. R. A. (N. S.) 270.

This is an entirely different proposition from that which underlies the intimated power of a court of equity to hold premises as against

the legal rights of the owners, because they are convenient or advantageous in the liquidation of bankruptcy assets. No well-considered authority sustains any such revolutionary proposition. 3 Remington, Bankr. § 984, where two District Court opinions are cited in support:

In In re Chambers, Calder & Co., 98 Fed. 865, Judge Brown enjoined the landlord from bringing ejectment proceedings against the court's receiver, who had taken possession of a stock of goods on leased premises. This decision rests on the well-recognized doctrine that the enforcement of the landlord's alleged legal rights must be primarily sought in the court that had taken possession of the leased premises. Judge Brown says (page 866):

"A court of quity, while giving the fullest recognition to a legal right, may so regulate the time and manner of its enforcement as not to cause unnecessary loss to others."

This doctrine, even if somewhat broadly stated, falls very far short of asserting a power of eminent domain in a bankruptcy court.

The other case which is commonly cited as an authority for this extraordinary proposition is In re Schwartzman, 167 Fed. 399, a decision of the District Court in South Carolina. But an examination of this case shows that it does not warrant the interpretation apparently put upon it in 3 Remington, Bankruptcy, 984.

The real decision in the Schwartzman Case was that the bankrupt was legally entitled to hold the premises until September, 1909, and that consequently the landlord should be enjoined from enforcing his erroneously claimed right of possession as of January 1, 1909. The decision was perfectly sound. It need hardly be remarked that any obiter dicta therein inconsistent with the decision as a whole, and with the current of authority elsewhere, are of no controlling weight.

Clearly Congress has never undertaken to vest in the federal courts having equity or bankruptcy jurisdiction power to seize and hold, as against the legal right of third persons, property convenient for the administration of bankruptcy or equity assets. No court, whose decisions are a binding or well-recognized authority, has asserted any such far-reaching doctrine. I do not think this court should even by implication commit itself to what I am compelled to regard as an unwarranted usurpation of power. This is a situation in which the axiom "equity follows the law" should be given full operation.