AMES et al. v. UNION PAC. RY. CO. et al.

(Circuit Court, D. Nebraska. May 9, 1896.)

1. INSOLVENT CORPORATIONS—DISTRIBUTION OF PROPERTY—TRUST FUND.
   The property of an insolvent corporation, seized for administration by a court of equity, constitutes a trust fund, pledged, first, for the payment of its creditors, and, second, for distribution among its stockholders.

2. SAME—RECEIVERS—DIVERSION OF PROPERTY AND INCOME.
   The receivers of the property of an insolvent corporation, in their hands for administration, cannot lawfully divert its income or its property from

its creditors and stockholders for the benefit of the creditors or stockholders of another corporation.

3. SAME—RECEIVERS OF RAILROAD SYSTEM.
The receivers of the property of the Union Pacific Railway Company, who were, by the order appointing them, also appointed receivers of the property of the constituent corporations which formed with it the Union Pacific System, took the property of each of these corporations, charged with this trust, for the benefit of its own creditors and stockholders.

4. SAME—UNION PACIFIC RAILWAY AND SUBORDINATE COMPANIES.
These receivers derived a large income from the operation of the railroads of the Union Pacific Company, and incurred a deficiency of $192,-630.17 from the operation of the railroads of the Denver, Leadville & Gunnison Railway Company. *Held*, the receivers could not lawfully divert the income or property of the former company from its creditors and stockholders to pay the deficit incurred by the operation of the property of the latter.

5. SAME—MORTGAGE FORECLOSURE—OPERATING EXPENSES.
The current operating expenses of mortgaged railroads, for a limited time anterior to the appointment of a receiver thereof under a bill to foreclose the mortgage, may be charged upon the income earned during the receivership, or upon the corpus of the property, as superior liens to that of the mortgage.

6. SAME—EXPENSES OF RECEIVERS—REIMBURSEMENT.
The claims of receivers, appointed under an administrative bill, for reimbursement for expenses justly incurred in the operation of mortgaged railroads for a limited time before a bill to foreclose the mortgage upon them is filed, is superior in equity to that of the mortgage, and should be first paid out of the income subsequently derived from the property, and, if that is insufficient, then out of the proceeds obtained from the sale of the property in the foreclosure suit.

(Syllabus by the Court.)

These were receivership and mortgage foreclosure proceedings against the Union Pacific Railway Company and the various subordinate or allied companies forming the Union Pacific System. The cause was heard on exceptions of the American Loan & Trust Company, trustee for the bondholders of the Denver, Leadville & Gunnison Railway Company, to the report of the master charging the deficiency arising from the operation of the railroads of that company as a preferential claim upon its property.

Edward W. Sheldon, Henry D. Hyde, and M. F. Dickinson, Jr., for American Loan & Trust Co.

W. R. Kelly, for Union Pac. receivers.

SANBORN, Circuit Judge. The Denver, Leadville & Gunnison Railway Company has 324 miles of railroad which connect with the railroads of the Union Pacific Railway Company at Denver in the state of Colorado, and extend into the mining districts west of that city. The Union Pacific Railway Company has 1,827.59 miles of railroads, and, among these, it has a main line, extending from Council Bluffs, in the state of Iowa, to Ogden, in the state of Utah, and another extending from Kansas City, in the state of Missouri, to Denver, in the state of Colorado. Prior to October, 1893, the Denver, Leadville & Gunnison Railway Company, hereafter called the "Gunnison Company," was a corporation which had issued its stock to the amount of $3,000,000, and its bonds to the amount of

$2,308,000, and it had secured the latter by a mortgage upon its railroad and appurtenances, dated August 1, 1889. The legal title to this stock and to these bonds was in the Union Pacific Railway Company, but both the stock and the bonds had been pledged by that company to secure certain of its obligations. The Union Pacific Railway Company was operating the railroads of the Gunnison Company by virtue of its ownership of its stock. It was operating its own railroads, and it was operating those of many other railroad companies, all of which were a part of the Union Pacific Railway System. The annual income of the railroads of the Gunnison Company had always been many thousand dollars less than the annual expense of operating them, and that company and the Union Pacific company had both become insolvent. In this condition of affairs, on October 13, 1893, for the purpose of preserving the vast property in the control of the Union Pacific Railway Company, and in the control of the constituent corporations constituting its system, from disintegration and dissipation, this court appointed S. H. H. Clark, Oliver W. Mink, and E. Ellery Anderson receivers of the property of the Union Pacific Railway Company, of the property of the Gunnison Company, and of the property of each of the other railroad companies that constituted a part of the Union Pacific System. This appointment was made under and pursuant to the prayer of a bill, filed in this court, on behalf of the complainants, who were stockholders of the Union Pacific Railway Company and of some of the other constituent companies of the system, and who sued on behalf of themselves and on behalf of all others similarly situated. In this suit the Union Pacific Railway Company, the Gunnison Company, and each of the other constituent companies were defendants. In their bill they alleged that each of these corporations was insolvent; that they were stockholders of the Union Pacific Railway Company and of several of the other constituent companies; that the Union Pacific Company owned the stock and bonds of the Gunnison Company; that it had pledged them as collateral to certain of its obligations; that it was operating the railroads of the Gunnison Company, and those of the other constituent companies of the system which it controlled, either through the ownership of their stock or through leases; that none of these corporations could obtain sufficient income to pay their accruing liabilities; that each of them was about to make default in the payment of its debts; that the holders of the obligations of these various corporations would soon have the right to sue upon them, and a multiplicity of suits would be commenced against each of these corporations; that the property of each of them would be seized to satisfy its debts at the suit of its creditors; that the Union Pacific System would be dismembered; and that the property of each of these corporations would be depreciated and dissipated, to the irreparable damage of their creditors and stockholders, unless receivers were appointed by this court to conserve this property, to operate these railroads, and to administer the trusts created by the insolvency of these various corpora-

tions. The complainants also alleged that it was greatly to the advantage of the Union Pacific Railway Company, and of its creditors and security holders, that the Union Pacific System should be preserved; and they averred that the severance of the various corporations which constituted it from the Union Pacific Company would result in a ruinous sacrifice to every interest in the property of each of these corporations. The prayer of these complainants was that this court would administer the trust fund in which they were interested, which consisted of the railroad system and property of the Union Pacific Railway Company; that it would marshal the assets and liabilities of that corporation, and of every other defendant corporation which constituted a part of that system; that it would ascertain and adjudge the liens and claims of each of the creditors and stockholders of each of these several corporations upon every part of its separate property; that it would appoint receivers to preserve all this vast property, and to operate these railroads meanwhile; and that it would grant such further relief as might be necessary to enforce the rights and equities of the complainants and of all the creditors and stockholders of all these corporations. Upon the filing of this bill the Union Pacific Company and the Gunnison Company appeared in this court and consented to the appointment of the receivers as prayed therein. Thereupon the receivers were appointed, and they took immediate possession of and operated the railroads constituting the Union Pacific System. The United States have a lien upon portions of the main lines of the railroad of the Union Pacific Company, and in November, 1893, pursuant to their petition, Frederic R. Coudert and J. W. Doane were appointed joint receivers with the three already chosen. In November, 1893, the Union Pacific Company made default in the payment of the interest on its bonds, which were secured by the pledge of the bonds of the Gunnison Company, and early in the year 1894 a committee of these bondholders of the Union Pacific Company consulted with the receivers, and learned that the income which they were deriving from the railroads of the Gunnison Company was much less than the expense of operating them. In June of that year the receivers presented a petition to this court in which they alleged that the operation of the railroads of the Gunnison Company produced a continually increasing deficit, and prayed for instructions as to the continuance of their operation. Notice of the hearing upon this petition was given to the American Loan & Trust Company, the trustee for the first mortgage bondholders of the Gunnison Company, to the Gunnison Company, and to all others interested. On the day of hearing, the American Loan & Trust Company presented a counter petition in which it prayed for the surrender of the property by the five receivers. The court immediately ordered these receivers to surrender it to a receiver to be appointed at the instance of the trustee, and directed the master to ascertain the amount of the deficiency caused by the operation of the railroads of the Gunnison Company by these five receivers between October 13, 1893, and Au-

gust 7, 1894, when they were directed to surrender it, and when they did surrender it, to Frank Trumbull, the receiver appointed by the circuit court for the district of Colorado under a bill to foreclose the first mortgage upon its property. The master was directed, not only to ascertain the amount of this deficiency, but to report the railroad or railroads against which it should be charged. That hearing has been had and the master has reported that the five receivers obtained a gross income of $385,736.39 from the operation of the railroads of the Gunnison Company between October 13, 1893, and August 7, 1894, and that they expended in operating these railroads during this time $153,067.63 more than the gross income they received; that in addition to this expenditure they paid $54,-134.20 taxes upon this property; and that they delivered to the receiver who succeeded them supplies and unused materials, on the line of the railroads, and in a storehouse at Denver, of the value of $48,870.15, which they had purchased for the railroads of the Gunnison Company, but which had not been charged against them in the account as stated above. The master also reported that there were no other railroads than the roads of the Gunnison Company against which this deficiency, these taxes, and these supplies could be justly charged, and that they should be charged against the property of that company, and made a first lien thereon superior to that of the first mortgage. The trustee under that mortgage has filed exceptions to this report, and it is upon these exceptions that the case is now before us.

The order of the court under which this report was made, and under which the five receivers surrendered possession of this property to the receiver appointed under the bill to foreclose the first mortgage, who succeeded them, provided that the master should report what, if any, portion of the deficiency which had resulted from the operation of this property of the Gunnison Company by the five receivers should constitute a lien upon its property, superior to that of the mortgage of August 1, 1889, and that the surrender and delivery of the property by these receivers was made subject to the lien and charge of any such deficiency as should be adjudged to exist upon the final hearing upon his report. The trustee for the bondholders appeared and litigated the questionable items of the accounts of these receivers before the master, and has filed several exceptions to the allowance of specific items in that account. These exceptions have been carefully considered, but the court is of the opinion that, with two exceptions, they ought not to be sustained. One of these exceptions is the judgment for $2,422.75 in favor of Ella Kelly for negligence of the Gunnison Company, which the receivers paid and charged to that company. Under Trust Co. v. Riley, 70 Fed. 32, 16 C. C. A. 610, that charge cannot be made a lien upon the property of the railroad company superior to the first mortgage upon it. The other exception is this: The testimony shows that the five receivers allowed to the Gunnison Company a credit of only one-half a cent per ton per mile for the transportation of ties over its roads for the benefit of other railroads in their hands; that this allowance was less than the

total cost of such transportation; and that, if they had allowed the compensatory rate in force when the testimony in this matter was taken, the income of the property of the Gunnison Company would have been increased $12,148.91. Counsel for the trustee rightly insist that it was the duty of these receivers to see that the creditors and stockholders of the Gunnison Company received fair compensation from every other estate they represented for the service which the property of that company rendered. A rate of one-half a cent per ton per mile was established as an interchange rate between the various lines of the Union Pacific System before these receiverships, and may not have been an unfair rate when the Union Pacific Company was operating all the constituent lines of that system, and paying all their deficits, whatever their rates of transportation. But when these five receivers were made receivers of the property of the Gunnison Company, they held it as trustees for the creditors and stockholders of that company, and they were required to manage and operate it in their interest, an. to obtain from every other estate they held, as well as from all other parties with whom they dealt, fair compensation for the service which this property rendered. They should credit the property of this company with $12,148.91 in addition to the credits which they have already given to it. The trustee insists that about $17,000 of the $48,870.14 charged against the Gunnison Company for supplies furnished by the five receivers to their successor ought not to be allowed in their account, because supplies to that amount still remain unused in the storehouse and yard at Denver, and the succeeding receiver refuses to accept them, although they were inventoried as a part of the property surrendered to him in August, 1894. The railroads of the Gunnison Company are narrow-gauge railroads. The railroads of the Union Pacific Company are broad-gauge railroads. All these supplies and materials were purchased for use upon the railroads of the Gunnison Company. These supplies, to the amount of about $31,000, were distributed along the railroads of that company when they were surrendered to the present receiver, while the supplies in controversy, of the value of about $17,000, were in the storehouse and yard at Denver, where they could be conveniently obtained and used upon the roads. The present receiver accepted and used the former, but declined to accept and pay for the latter. But the latter were purchased for use upon the railroads of the Gunnison Company, as well as the former. It was necessary to the maintenance and operation of those railroads that a reasonable amount of supplies and materials should always be on hand to replace worn rails, ties, and equipment, and to guard against accidents and unreasonable delays. There is nothing in the evidence or in the report of the master to show that the amount purchased by the five receivers, and on hand when they surrendered this property, was unreasonable or abnormally large; and, in the absence of such proof, I think the entire amount should be delivered to and received by the present receiver, and should be charged against the property of the Gunnison Company.

The other exceptions to the specific items of the account allowed by the master are in the nature of an argument that the receivers might have made better contracts, and might have operated the property more economically, because better contracts have since been made and a more economical operation of the roads of this company has since been had. To the mind of one of limited observation and experience in railroading this argument is not convincing. There are few railroads in this country that have not been operated more economically during the year commencing August 7, 1894, than they were in the year commencing August 7, 1893,—that year of high prices, of panic, Coxeyism, strikes, and turmoil. If every railroad manager were to be charged with the excess of the operating expenses of the latter year over the former, perhaps few of them would remain solvent. There is nothing in the evidence or in the findings of the master in this case which tends to show that these receivers were not fairly administering this property, with reasonable prudence and diligence, during the time they were in possession of it; and I cannot disallow the expenses they incurred or paid in the course of such an administration because they might have, or another has, operated these railroads with less expense during the succeeding year.

The main contention of the counsel for the trustee, however, is that the claim of these receivers to be reimbursed for the deficiency which resulted from their operation of this property for 10 months, for the taxes upon it which they paid, and for the materials and supplies which they delivered to their successor, ought not to be preferred to the claim of the bondholders secured by the mortgage of August 1, 1889, and, indeed, ought not to be paid out of the property of the Gunnison Company at all, because these receivers were not appointed at the request or with the consent of the holders of these bonds, but at the suit and on the motion of stockholders of the Union Pacific Company. They insist that the five receivers were appointed for the purpose of preserving as a unit, and of operating as an entirety, the Union Pacific System for the benefit of the Union Pacific Company, and that any loss which resulted from operating any railroad which was a part of that system should be borne, not by that part, but by the property of the Union Pacific Railway Company. Their argument runs in this way: If the Union Pacific Company had operated the railroads of the Gunnison Company during this period, and had incurred and paid the deficiency now in question, it could not have enforced a preferential claim upon its property against the bondholders of that company. The five receivers were appointed at the instance of the stockholders of the Union Pacific Company, and primarily for the benefit of that company and its stockholders. Therefore, they stand in the shoes of the Union Pacific Company, and they can enforce no claim for a deficiency against the property of the Gunnison Company which the Union Pacific Company could not have enforced, if it had incurred and paid the deficiency. Let us consider this argument. Do its premises warrant its conclusion? Do receivers of an insolvent corporation, appointed at the

suit of stockholders or creditors, stand in the shoes of the insolvent corporation, or in the shoes of the complainants in the suit? Have such receivers no higher right or greater power to charge the trust estate in their hands with the current liabilities which they incur in its administration than the insolvent corporation or the complainants in the suit, at whose instance or for whose benefit they were appointed, would have had if they were operating the property?. An affirmative answer to these questions is indispensable to the maintenance of this argument. We had occasion to consider them early in the administration of these trusts, and our conclusion was thus expressed:

"It is well settled that the receivers of an insolvent railroad corporation, appointed by a court of chancery, to preserve its property and operate its railroads, do not stand in the shoes of the corporation. They are neither the representatives of the insolvent corporation, nor of its creditors or stockholders. They are the officers and representatives of the court, the hands of the court, in which it holds the property while it operates the railroads of the insolvent corporation for the benefit of those ultimately entitled to the property and the income." Ames v. Railway Co., 60 Fed. 966, 969.

In Union Bank of Chicago v. Kansas City Bank, 136 U. S. 223, 236, 10 Sup. Ct. 1013, the supreme court said:

"A receiver derives his authority from the act of the court appointing him, and not from the act of the parties at whose suggestion or by whose consent he is appointed." Railroad Co. v. Humphreys, 145 U. S. 82, 97, 12 Sup. Ct. 787.

These five receivers, then, were the custodians of the property of each of these corporations, the mere ministerial officers of the court, charged with the duty of preserving and operating the railroads of each of these corporations, for the benefit of those who should ultimately be adjudged to be entitled to the income they derived and the proceeds of the property they sold. The corporations to which the various properties belonged were insolvent. They were unable to discharge their duties to the public,—their duties of maintaining and operating these railroads. They were unable to discharge their duties to private citizens,—their duties of performing their contracts and paying their debts. The receivers were, therefore, neither bound by the contracts nor limited by the contractual relations of these corporations. They stood not in the shoes of the corporations nor of the complainants in the suit, but they stood in the place of the court. They were the hands of the court, preserving and operating the properties in their charge under its direction. Moreover, these receivers held the property of the Union Pacific Railway Company, the property of the Gunnison Company, and the property of each of the other railroad companies in their hands as receivers in this case, under a trust imposed upon the property of each of these corporations by the law. They held the property of each of these corporations under a trust, separate, distinct, and different from the trust under which they held the property of every other one of these corporations.

The property and income of an insolvent corporation, seized by a court of equity for administration, constitutes a trust fund sacredly pledged—First, to the payment of its debts; and, second,

to distribution among its stockholders. Butler v. Cockrill, 73 Fed. 945 (decided by the United States circuit court of appeals of the Eighth circuit at the December term, 1895); Graham v. Railroad Co., 102 U. S. 148, 161; Railway Co. v. Ham, 114 U. S. 587, 594, 5 Sup. Ct. 1081; Richardson's Ex'r v. Green, 133 U. S. 30, 44, 10 Sup. Ct. 280; Hayden v. Thompson, 17 C. C. A. 592, 71 Fed. 60; Stuart v. Hayden, 18 C. C. A. 618, 72 Fed. 402, 405. The moment that a court of equity appoints receivers of the property of such a corporation, they hold it and the income they derive from it charged with this trust, imposed upon it by the law, and they may not legally divert either the property or its income to any other object. Take the Union Pacific Railway Company in this case. When Clark and his associates were appointed receivers of the property of that company, they took it as trustees, to operate and preserve its railroads and their income—First, for the creditors; and, second, for the stockholders of that corporation. These trusts were not—they could not be—released, modified, or changed by the fact that the appointment of these receivers was made at the instance of the stockholders of the one or the other of these corporations. These trusts arose from the insolvency of the corporations and the seizure of their property by the court through the exercise of its chancery powers. They were not dependent for their existence or their character upon the personnel or purposes of those at whose instance the receivers were appointed. It follows, from these indisputable principles of the law, that it was not material to the discharge of the duties of the five receivers in this case, or to the decision of the question here under consideration, that the complainants in the original bill prayed or intended that these receivers should manage and operate the properties of all these corporations in the interest and for the benefit of the Union Pacific Company. Nor was it material whether or not the receivers themselves thought that method of operation most beneficial for the property of these corporations. If the complainants had such an intent and purpose, that fact did not change the duty of the court or of the receivers, who were the hands of the court, when they had been appointed. The moment their appointment was made, they held the property of each corporation in trust for its own creditors and its own stockholders. If it was for their advantage to operate its railroad as a part of the Union Pacific System, then it was the duty of the receivers to so operate it. If that course was not to their interest, then it was the duty of the receivers to operate it otherwise. They were bound, under the law, and the trust which it imposed upon them, to manage and operate the railroads of each of these corporations for the benefit and in the interest of the stockholders and creditors of that corporation. They could not lawfully divert the income, the property, or the proceeds of the property of any of these railroad companies from its creditors or stockholders, to pay the expenses of the operation of the railroads of another corporation, or to advance the interests of its stockholders or creditors. If, before the receivership, the Union Pacific Company had expended

its income in operating the railroads of other corporations at a ruinous loss, and had thus made itself insolvent, that was but another reason why these receivers should avoid that error, why they should scrupulously obey the law and faithfully discharge the trust imposed upon them.

Counsel for the trustee insist that the deficiency which resulted from the operation of the railroads of the Gunnison Company by the five receivers, the amount paid by them for taxes upon its property, and the $48,870.15 due them for supplies and materials furnished to the succeeding receiver for the railroads of this company, should be paid by these receivers out of the income or out of the property of the Union Pacific Company. But how can this be legally done? Would not such a payment be a violation of the fundamental principles of the law of trusts? Would it not be a diversion of the trust funds which, as receivers of the Union Pacific Company, they hold for the benefit of its creditors and stockholders, to the payment of a debt which, as receivers of the Gunnison Company, they incurred in preserving, maintaining, and operating the property of that company for its creditors and stockholders? These receivers are as much bound to a careful discharge of the duties imposed upon them by each of these trusts as they would be if they were the receivers of but one of these corporations. If other individuals had been the hands of the court in the operation of the railroads of the Gunnison Company, could they have successfully claimed that the receivers of the property of the Union Pacific Company should pay a deficiency which they had incurred in operating the railroads of the Gunnison Company, or in paying taxes upon that property, or in purchasing supplies for the railroads of that company? If, as receivers of the property of the Gunnison Company, these receivers had realized a large net income from the property of its railroads, could they have lawfully diverted that income from its creditors or stockholders to the creditors and stockholders of the Union Pacific Company? Could they have lawfully used that income to pay a loss occasioned by the operation of a railroad of the Union Pacific Company or by the operation of the railroad of any other corporation than the Gunnison Company? These questions are their own answers, and they are fatal to the claim of this trustee that the deficiency incurred by the operation of the railroads of the Gunnison Company, or the taxes upon its property, or the purchase price of the materials and supplies furnished to the succeeding receiver, may be lawfully paid out of the trust funds of the creditors of the Union Pacific Company. These expenditures must be charged against the property of the Gunnison Company,—against the property the administration and operation of which caused them. And the only question remaining is, are they superior in equity to the claims of the bondholders secured by the mortgage of August 1, 1889?

The proposition is now too well settled to permit of argument that there are certain claims against a mortgaged railroad company, accruing before the appointment of a receiver in foreclosure, which are entitled to a preference, over a prior mortgage debt, in

payment out of the earnings of the railroad during the receivership, and out of the proceeds of the sale of its property. Many of the authorities which maintain this proposition, and the reasons which support it, are briefly cited and set forth in Trust Co. v. Riley, 16 C. C. A. 610, 612–616, 70 Fed. 32. See, especially, Hale v. Frost, 99 U. S. 389, 392; Miltenberger v. Railroad Co., 106 U. S. 286, 308, 311, 1 Sup. Ct. 140; Trust Co. v. Souther, 107 U. S. 591, 593, 595, 2 Sup. Ct. 295; Burnham v. Bowen, 111 U. S. 776, 783, 4 Sup. Ct. 675; Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 454, 459, 6 Sup. Ct. 809; Wallace v. Loomis, 97 U. S. 146. There can be no doubt, under these decisions, that the claims now presented by these receivers are of such a character that, if they had been unpaid when the present receiver was appointed, the court might well have charged them upon the property of the Gunnison Company as superior in equity to the lien of its mortgage. They were, before the five receivers paid them, claims for the current operating expenses of the railroads of that company for a limited time, certainly not exceeding six months, prior to the filing of the bill for foreclosure. It was necessary that the current running expenses of the railroad should be paid. It was important that the taxes should be discharged, for they were a lien superior to that of the mortgage, and a failure to pay them would necessarily result in increased expenditures for added penalties. All the expenses for which these receivers seek reimbursement were incurred and paid to maintain the railroads of this company, to keep its property a going concern and to protect it against a claim superior to the mortgage. If these claims were now in the hands of the creditors who originally held them, it would be the duty of the court to prefer them to the mortgage bondholders in the distribution of the proceeds of this property. It is not perceived why the equities of these receivers, who have paid these claims under the direction of the court, are not as strong as those of the creditors who originally held them would have been, if they had not been paid. It is not perceived why they are not much stronger, for they are supported by the established rule that the expenses of the preservation and administration of a trust estate constitute a first lien upon the trust fund superior to the claims of any of the cestuis que trustent. Butler v. Cockrill, supra; Mechem, Ag. § 684; 2 Jones, Liens, §§ 1175, 1177; 2 Lewin, Trusts, § 639.

Again, this court might well have authorized these receivers to borrow and to issue their certificates for the money required to pay this deficiency, these taxes, and the purchase price of these supplies and materials, and might have made the certificates a lien upon the property of the Gunnison Company superior to that of the mortgage. It might have done this without notice to the trustee under the mortgage, provided, always, that that trustee had a subsequent opportunity to be heard as to the merits of the order, and as to the application of the funds derived from the certificates. Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 459, 6 Sup. Ct. 809; Wallace v. Loomis, 97 U. S. 146; Miltenberger v. Railway Co., 106 U. S. 286, 311, 312, 1 Sup. Ct. 140. The trustee

in the case before us has had an opportunity to question and litigate the claims now presented. It is not perceived why receivers, who furnish the money, without interest, under the direction of the court, to pay such claims, are not equitably entitled to the same superiority of lien for their reimbursement that the holders of their interest-bearing certificates would have had, if the receivers had borrowed the money upon those certificates for these purposes. It is said that the deficiency was large, and the expenses of operating were great. It is unfortunate that the receivers were not able to operate the railroads of this company without a deficiency, but no one had ever been able to do so before them, and this court constantly stood ready to surrender this property to the trustee under the mortgage whenever it would take it, and ordered its surrender on the first day the trustee consented to do so. If the trustee or the bondholders were unwilling that these receivers should continue to operate it so long at a loss, they could have secured its surrender earlier. The expenditures for which they now seek reimbursement were incurred and paid in an honest endeavor to administer their trust for the benefit of the bondholders secured by this mortgage and the other creditors of the corporation. These expenditures furnished to the succeeding receiver a normal and necessary amount of supplies and materials for the maintenance of these mortgaged railroads. These expenditures maintained these railroads in good repair, and kept them a going concern for 10 months. These expenditures paid the taxes upon the mortgaged property, which must otherwise have been paid by the bondholders. The claim of these receivers for a lien upon the property of the Gunnison Company, superior to that of the mortgage, for their reimbursement for these expenses, is, in my opinion, founded in reason and supported by authority, and it must be allowed.

The receivers must credit the property of the Gunnison Company with $2,422.75 on account of the charge of the payment of the Kelly judgment, and with $12,148.91, in addition to the amount already credited on account of the transportation of ties over its railroads, and to that extent the exceptions to the report of the master will be sustained. All other exceptions are overruled.