In re NEW YORK, N. H. & H. R. CO.
No. 16562.

District Court, D. Connecticut.
Jan. 16, 1939.

W. W. Meyer, Gen. Counsel, and Hermon J. Wells, both of New Haven, Conn. (Fleming James, Jr., of New Haven, Conn., of counsel), for trustees, New York, N. H. & H. R. Co.

White & Case, Joseph M. Hartfield, and Fitzhugh McGrew, all of New York City, and Wiggin & Dana and Stewart H. Jones, both of New Haven, Conn., for Bankers Trust Co.

Malcolm Fooshee and John E. Masten, both of New York City, for the insurance group.

Bentley W. Warren and John Noble, Jr., both of Boston, Mass., appearing specially for Boston & Providence R. Corporation.

HINCKS, District Judge.

A proper appraisal of the jurisdictional objections raised by Boston and Providence Railroad Corporation (hereinafter referred to as B P) requires a statement of facts which includes a review of certain phases of the proceedings heretofore had in this matter. Such a statement I find accurately set forth in the brief of the Old Colony trustees which I borrow for purposes of this memorandum. It is as follows.

Upon approval on October 23, 1935 of the petition of the New Haven for reorganization there came into the custody of this Court not only the property owned by the New Haven but also the property which it had leased in 1893 from the Old Colony, including the property of the Boston and Providence which Old Colony had leased from that Company in 1888. By its initial order (R., p. 5) this Court provided, inter alia, for continued operation of the railroad subject to such supervision and control as the Court might exercise by further orders and for payment of all necessary current operating expenses. The order enjoined all interference with all property "belonging to, or in the possession of" the New Haven (R., p. 11). Thereafter, upon hearing duly noticed (R., p. 13) Trustees were appointed (R., p. 85) and upon their qualification entered upon the administration and operation of the property, including the property of the Boston and Providence in which the New Haven had a subleasehold estate.

On June 2, 1936 the New Haven Trustees rejected the Old Colony lease (R., p. 721) and the next day the Old Colony petitioned (R., p. 731) for reorganization herein and requested that the New Haven Trustees continue to operate the property of Old Colony. This petition was approved (R., p. 747) and after hearing duly noticed (R., p. 750) this Court by Order No. 75 (R., p. 875) appointed the same persons who were acting as Trustees of the property of the New Haven as Trustees also of the property of the Old Colony. The order provided, however, that until further order of the Court the property of Old Colony should be operated by the New Haven Trustees as an integral part of the system. This property, including the property of the Boston and Providence in which the Old Colony had a leasehold estate, has continued to be operated by the New Haven Trustees to the present time.

By paragraph 2, subparagraph (c), of Order No. 75, the New Haven Trustees were empowered and authorized to pay such sums as might be necessary to comply with the obligations of Old Colony under contracts or leases, subject however to the direction that such payments should not constitute affirmation of such contracts or leases or any of them, and by paragraph 7 of said Order it was provided that said Trustees, either as such or as Old Colony Trustees, should not intentionally make or permit any default in the performance of any contract or lease to which Old Colony was a party unless and except upon the advice and with the consent of the Court previously obtained after hearing duly noticed. By paragraph 9 of said Order the Old Colony Trustees were authorized at any time prior to November 15, 1936 or. prior to such other day as might be provided by further order of the Court, and with the advice and consent of the Court after hearing duly noticed, to reject any of the existing contracts or leases of Old Colony; and it was further provided in said paragraph 9 that the performance by Old Colony, by the Old Colony Trustees or by the New Haven Trustees for the account of Old Colony, of such contract or lease within said period or future periods allowed for rejection should not constitute or be evidence of the adoption or acceptance of such contract or lease by Old Colony or by the Old Colony Trustees, or the waiver of the right to disaffirm or reject the same, and that in case payments were made pursuant to the authority granted by the terms of said order or of any other order in the proceeding, to comply with the obligations of Old Colony under leases and such leases should be subsequently disaffirmed or rejected by Old Colony or by the Old Colony Trustees or under a plan of reorganization, "the operation of the leased properties shall have been and said payments shall be deemed to have been made for the account of the lessor, and such payment shall be recovered, set-off, or made and charged, on the earnings and properties of the lessor, prior to any mortgage or other lien thereon by such method as the Court shall determine, and further reserving all rights and equities of the parties arising from such payments." The

provisions that payments under leases should not constitute affirmation of such leases and for charging the earnings and properties of the lessor in case of subsequent rejection for the operation of the leased properties and said payments were similar to provisions previously entered with respect to leases under which the New Haven was lessee (Order No. 1, R., p. 5; Order No. 17, R., p. 131).

The Boston and Providence, its officers, agents and counsel have had knowledge of the terms of Order No. 75 continuously since its entry (Exh. 6 on hearing on Trustees' Report of Administration, June 2, 1938). On May 25, 1937, the Boston and Providence asked leave to intervene generally herein (R., p. 2635) and two days later their petition was granted (R., p. 2643). On April 19, 1938 the Trustees, having been directed by the Court so to do, filed herein a report of administration of the property of Old Colony and Providence, Warren & Bristol Railroad Company up to and including December 31, 1937 (R., p. 4221). By Order No. 300 entered July 18, 1938 (R., p. 4593) the Court approved the accounts as stated in that report in the amount of $11,789,730.22 (R., p. 4594) which amount included $3,955,298.93, purported to cover administration of the property of the Boston and Providence for the period June 4, 1936 to December 31, 1937, both dates inclusive. The Boston and Providence actively participated at the hearing on this report and the Court on its petition (R., p. 4529) held a supplemental hearing respecting these accounts.

On July 19th the Court entered Order No. 217 (R., p. 4597) directing the Old Colony Trustees to reject the Boston and Providence lease, and providing among other things as follows:

"5. Pending further order of Court the operation of the property of Boston and Providence for the account of that corporation shall be continued pursuant to subdivision (c) (6) of Sec. 77 of the Bankruptcy Act, and since the Old Colony Railroad Company, as lessee of Boston and Providence, and likewise the Old Colony Trustees, are wholly without any operating organization, the operation of Boston and Providence properties shall be conducted by the New Haven Trustees in behalf and for the account of the Old Colony estate but without expense to the New Haven estate.

"The Court reserves for further hearing the right to determine the existence and amount of any obligation of Boston and Providence arising out of operation of its property or payments made to it or on its behalf prior to the rejection of its lease, and the liability of the Boston and Providence therefor to the Old Colony estate and by way of subrogation to the New Haven estate. And pending such determination the Court will withhold its final ruling on Petition for Order No. 276."

On the same day the Old Colony Trustees did reject the Boston and Providence lease (R., pp. 4601, 4602). On July 27, 1938 the Old Colony and New Haven Trustees filed their Petition for Order No. 301 (R., p. 4621). In their petition they referred to Order No. 300 (R., p. 4593) reported that the sum charged against the earnings and property of Old Colony included $3,955,298.93 covering payments made under the Boston and Providence lease and expenditures incurred in the administration of the property described in that lease during the period from June 4, 1936 to December 31, 1937, both dates inclusive, and asked the Court to approve the account against the Boston and Providence in that amount and order that it "constitute a lien and charge on the earnings and property of Boston and Providence Railroad Corporation in the possession of this Court prior to any mortgage or other lien, charge or claim thereon and prior to any other indebtedness of said Company as an expense of administration of said property of said Company by the Trustees of the property of the Principal Debtor herein on behalf and for the account of the Trustees of the property of Old Colony Railroad Company, and may be recovered by said Trustees of the property of Old Colony Railroad Company or, in the alternative, by the Trustees of the property of the Principal Debtor out of the earnings and property of said Boston and Providence Railroad Corporation by such method as the court shall hereafter determine, and that to the extent that said amount is so recovered by said Trustees of the property of the Principal Debtor the like charge against the earnings and property of Old Colony Railroad Company heretofore allowed by Order No. 300 shall be correspondingly reduced, and that the Court reserve for later determination the amount of like charges covering administration

of the property of said Boston and Providence Railroad Corporation from January 1, 1938 to the date of rejection of the aforesaid lease."

On August 4, 1938 the Provident Institution for Savings, a creditor of the Boston and Providence, filed a petition for reorganization of the latter under Sec. 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, in the District Court of the United States for the District of Massachusetts. The petition recited that the Boston and Providence lease had been rejected and that this Court had ordered that pending its further order the operation of the property of the Boston and Providence for the account of that company should be continued pursuant to subdivision (c) (6) of Section 77 of the Bankruptcy Act.

The Boston and Providence filed an answer to this petition admitting the material allegations therein. The petition was approved by the Massachusetts Court on August 5, 1938, the order enjoining all persons wherever situated from "interfering in any manner with the present operation of its (the Boston and Providence) railroad or properties or the carrying on of its business".

On August 6, 1938 Bankers Trust Company, as Trustee under the New Haven First and Refunding Mortgage, filed an answer herein to Petition for Order No. 301 (R., p. 4663), joining in the prayer and asking for further relief.

The Massachusetts Court appointed Messrs. Warren and Mulcahy as Trustees of the B P estate, and pending the ratification of these appointments, the hearing on Petition for Order No. 301, originally set for August 9, 1938, was several times continued at the request of B P in order that Trustees of B P fully qualified might have an opportunity to appear. However, when Petition for Order No. 301 finally came on for hearing the B P Trustees, though present in person declined to appear of record, and counsel for the B P debtor corporation pressed a written statement of objections to the jurisdiction of the Court to entertain Petition for Order No. 301.

Section 77(a) provides: "If the petition is so approved, the court in which such order is entered shall, during the pendency of the proceedings under this section and for the purposes thereof, have exclusive jurisdiction of the debtor and its property wherever located, and shall have and may exercise in addition to the powers conferred by this section all the powers, not inconsistent with this section, which a Federal court would have had if it had appointed a receiver in equity of the property of the debtor for any purpose. Process of the court shall extend to and be valid when served in any judicial district."

Under this provision, the Massachusetts Court acquired a jurisdiction over the estate of the B P which is stated to be "exclusive." And there is an abundance of cases enunciating the proposition that in such a conflict as is here disclosed the jurisdiction of a court having a paramount jurisdiction under the Bankruptcy Act will supersede the jurisdiction of a court which is not a Court of Bankruptcy. See Gross v. Irving Trust Company, 289 U.S. 342, 53 S.Ct. 605, 77 L.Ed. 1243, 90 A.L.R. 1215. If the Connecticut Court had been operating B P property through an equity receivership, unquestionably its jurisdiction to ascertain and assess operating deficits would have terminated upon the intervention of the Massachusetts proceeding under Section 77.

But under the same provision of Section 77(a), this Court acquired a jurisdiction over the estate of the New Haven which was also "exclusive". And the estate of the New Haven included a leasehold interest in B P. As successors to the lessees under the B P lease, the New Haven trustees were required to possess and operate the B P property. This responsibility, I hold, survived the rejection of the B P lease and the subsequent intervention of the Massachusetts proceeding for the reorganization of B P under Section 77. Indeed, the propriety of this holding was recognized by the Massachusetts Court itself which, in the order approving the petition for the reorganization of B P, enjoined interference with the "present operation of" B P property, i. e., the operation by the New Haven trustees. Apparently, nothing short of a proper petition for the repossession of B P properties proposing operation thereof by the B P trustees in reorganization, on the one hand, or an authorization of abandonment pursuant to Section 77(c) (6), on the other hand, can serve to relieve the New Haven trustees of their responsibility to carry on.

The persistence of this duty of the New Haven trustees is clearly implied

from the provisions of Section 77(c) (6). Also it was such a duty as devolved upon receivers in equity proceedings for the reorganization of railroad properties, Quincy R. Co. v. Humphreys, 145 U.S. 82, at page 98, 12 S.Ct. 787, 36 L.Ed. 632; American Brake Shoe and Foundry Co. v. N. Y. Rys. Co., 1 Cir., 282 F. 523, at page 528, and thus devolved upon trustees under Section 77 under the provision of subdivision (c) (2) of that Act whereby the trustees if authorized by the judge (as they were here) are vested with all "the powers of a receiver in an equity proceeding." Thus the exclusive jurisdiction of this Court over New Haven and Old Colony properties has carried with it by operation of law the duty through its trustees to possess and operate B P property and a jurisdiction at least commensurate with that duty.

■ The grant, as well as the measure, of that jurisdiction is contained in the extract from Section 77(a) above quoted, viz., "all the powers, not inconsistent with this section, which a Federal court would have had if it had appointed a receiver in equity of the property of the debtor for any purpose." Thus the grant included a jurisdiction, as broad as that of a court having primary or domiciliary jurisdiction over an equity receivership, to ascertain the operating deficits of a leased line incurred while operated by its receiver, even though the lessor thereof was in receivership elsewhere, and to assess such deficits against the leased property. Ames v. Union Pac. R. Co., C.C., 60 F. 966, at page 974; Idem, C.C., 74 F. 335; Pennsylvania Steel Co. v. N. Y. City R. Co., 1 Cir., 225 F. 734; Id., C.C., 176 F. 467.

The inclusion of such a power in the grant of jurisdiction is not inconsistent with Section 77. On the contrary, it dovetails perfectly into the legislative scheme. It is in essence but one manifestation of the power to issue trustees' certificates expressly lifted from equity practice into Section 77 by subdivision (c) (3) thereof. Indeed, if and in so far as this court has authorized the operation of B P property at a loss, its action was merely tantamount to authority to the Old Colony trustees, who were principally charged with the duty to operate but were without the necessary means, to sell their certificates to the New Haven estate coupled with reciprocal authority to the New Haven to purchase such certificates. Furthermore, the power upon a dismissal of the proceedings to condition the surrender of property upon terms adapted to protect obligations incurred by the trustees is expressly provided by subdivision (i) of the Act. Yet such a power is but the exercise at a possible later stage in the proceedings of the power now challenged. And why should Congress have provided in subdivision (c) (10) for a "segregation and allocation * * * of the earnings and expenses between and to the divisions and parts of the railroad * * * separately subject to the liens * * * or * * * separately subject to lease" unless it had contemplated that in the course of the proceedings the court would give effect to such segregation and allocation? Obviously, if a deficit allocable to a leased line is not charged against that property, the court is without means to assure to other divisions of the system owned by the debtor earnings found to be properly allocable thereto.

And so it seems clear that this court, as an incident to its duty to operate B P property, originally acquired jurisdiction to ascertain and assess any deficits resulting from such operation against the property and that this power, still as an incident to the duty, survived the rejection of the B P lease.

■ Thus we are brought to the question whether the power similarly survived the intervention of the Massachusetts proceeding. As to this, I hold that it did and base my conclusion upon two grounds.

First. The text of the Act, in the light of its legislative history, discloses a legislative intent that the power of this court to impose liens against B P property should cover all operations of that property by the trustees of this court which were so conducted under a duty to operate. To be sure, the grant of "exclusive jurisdiction", if viewed for its relation only to the Massachusetts court, suggests a legislative intent contrary to my conclusion. But this suggestion is cancelled by the corresponding inference from the grant of the same "exclusive" jurisdiction to this court. Consequently we must look elsewhere in the Act for clues as to the legislative intent. Thus I come to subdivision (c) (6) of Section 77. Clearly "the judge" referred to in this paragraph is the judge of the court having jurisdiction over the lessee and its estate. Under this paragraph, in the absence of a prior demand by the lessor's trustees for repossession (for such

a demand if authorized by the Massachusetts court would doubtless terminate the duties of the New Haven trustees to continue operations) it lies within the power of this court to determine whether the duty of operating the lessor's property shall rest upon the lessor (or its trustees) or upon the lessee (or its trustees) for the lessor's account. The paragraph contemplates a situation in which "it would be impracticable and contrary to the public interest for the lessor to operate the said line." Clearly Congress had in mind the possibility of a lessor which for lack of available funds or competent operating organization could not perform its obligation to the public; in other words, a lessor which was eligible for reorganization. The grant of power to the court having jurisdiction over the lessee to fix the incidence of the burden of operation as between the lessee and a lessor eligible for reorganization under another court of bankruptcy, surely points to an intent that the jurisdiction of the former to ascertain and assess deficits resulting from the operation of its trustees shall survive irrespective of the intervention of proceedings elsewhere for the reorganization of the lessor.

Under Section 77 (c) (3), as noted above, this Court was given a jurisdiction which clearly included the power by the sale and issue of trustees' certificates to raise funds required to perform its obligation to the public to operate the B P property. There being nothing in the grant of this power and nothing in the Act to indicate that this power was to terminate upon the intervention of proceedings elsewhere, this power must be deemed to survive. That being so, the cognate power of this Court to assess operating deficits likewise must be deemed to survive.

Section 77(i) provides that a court dismissing a proceeding under Section 77 may transfer the debtor's assets to receivers or trustees appointed "prior or subsequent to the institution of a proceeding under this section * * * upon such terms as the court in the proceeding under this section may deem equitable for the protection of the obligations incurred by any trustee or trustees appointed under this section." If this court is thus empowered to safeguard the obligations of its trustees upon a dismissal of the proceedings, it can scarcely be inferred that Congress intended more narrowly to circumscribe the power of the court to safeguard the obligations of its trustees with respect to property still remaining in their sole possession for the continued operation of which they are currently responsible.

The legislative history of Section 77 as well as every consideration of common sense supports this uncovering of the legislative intent. Through its trustees this court has been operating under leases rejected in these proceedings, as integral parts of the New Haven system, lines of lessors two of which are domiciled in Connecticut, one in Rhode Island, and two in Massachusetts, omitting reference to other leases not rejected. Legally each of these lessors was as well entitled as B P to reorganize in the jurisdiction of its domicil. Had this occurred, the suggestion that the accounting for the operations by the New Haven trustees should be had not in the court of their appointment but in numerous courts elsewhere would be directly at variance with the Congressional intent that Section 77 should furnish a more simply coordinated arrangement for the reorganization of railroad systems and for their operation pending reorganization, than the device of the equity receivership with its multiplicity of ancillary receivers. If accepted, the suggestion would tend greatly to foment conflicts between coordinate courts and compel creditors, in the protection of their interests, to ride the circuit, demonstrating the basis of their positions in successive courts. Surely such a state of affairs would not constitute the intended improvement over the practice in equity receiverships, wherein the task of ascertaining charges and assessing liens had been consolidated, as we have seen, in the court of primary jurisdiction.

■ B P seems in part to rely upon certain language contained in Section 77(i) which provides for transfers of title to a debtor or to the trustees of its estate from "a receiver or trustee of all or any part of" the debtor's property appointed "by a Federal or State court". Certainly this court never purported to appoint receivers or trustees for B P or any part of its property. It appointed trustees for the New Haven estate to operate the New Haven system which then comprised a leasehold interest in B P. Thus these provisions of Section 77(i) are seen to have no application to the situation here involved. No one questions the title of the B P trustees, or their right to obtain possession as soon as they are in a position to operate.

But even if the trustees of this court by reason of their possession and operation of B P property could be deemed to have been appointed as trustees of B P property, I could not properly construe Section 77(i) to oust this court of jurisdiction. For as was observed with respect to the analogous provision in Section 77B (see 77B(i), 11 U.S.C.A. § 207(i), in DuParquet, Huot & Moneuse Co. v. Evans, 297 U.S. 216, 56 S.Ct. 412, 80 L.Ed. 591, Section 77B was enacted as an improvement over reorganization proceedings in equity and hence was held as not intended to mean that the jurisdiction of a bankruptcy court under Section 77B should supersede the jurisdiction of a prior foreclosure receivership. By a parity of reasoning, by Section 77(i) it was intended only that the jurisdiction of a court under Section 77 should supersede prior reorganization proceedings in equity—not the jurisdiction which a coordinate court of bankruptcy had acquired but not exhausted also under Section 77. Indeed this intent is further evidenced by the provision of subdivision (i) which authorizes a court having jurisdiction of reorganization proceedings upon the dismissal of the proceedings, "to transfer possession of the debtor's property within the territorial jurisdiction of such Federal or State court to the prior receiver or trustee." Thus this provision is seen to be directed to the relation between courts under Section 77 and courts whose jurisdiction is subject to a territorial limitation as distinguished from courts of bankruptcy which under Section 77(a) have "exclusive jurisdiction of the debtor and its property wherever located."

Something is said in the briefs about Section 67(f) of the Bankruptcy Act, 11 U.S.C.A. § 107(f). I cannot see that this Section has any applicability to the question of jurisdiction. If, at a later stage, either here or in Massachusetts, B P shall contend that Section 67(f) has efficacy to invalidate a claim of lien asserted by the Old Colony trustees, then will be the proper time for the entry of an appropriate ruling.

Nor is Section 77(j) helpful to the present contentions of B P. To be sure, when Petition for Order No. 301 was originally filed before the intervention of the Massachusetts proceedings, it included a prayer for relief contemplating enforcement by this Court. But in view of the pendency of the Massachusetts proceedings, this prayer has now been disclaimed by Old Colony trustees. With this limitation by disclaimer, the petition contains nothing inconsistent with such power as the Massachusetts Court may have under Section 77(j) to prevent the enforcement of liens which may be adjudicated by this Court. As to the presence or dimensions of such power, there is no need now to express an opinion.

■ Second. Even if there were a complete absence of evidence of the legislative intent in the text and history of the Act, my holding would still be required. For we are now concerned with a conflict between two coordinate courts of concurrent, overlapping jurisdiction, neither belonging to a class which by paramount law is categorically given a jurisdiction over the particular subject matter paramount to the jurisdiction of the other.

In such cases, it has long been settled that "where a court of competent jurisdiction has, by appropriate proceedings, taken property into possession through its officers, the property is thereby withdrawn from the jurisdiction of all other courts. Wabash R. Co. v. Adelbert College, 208 U.S. 38, 54, 28 S.Ct. 182, 52 L.Ed. 379. Compare Oklahoma v. Texas, 258 U.S. 574, 581, 42 S.Ct. 406, 66 L.Ed. 771. Possession of the res disables other courts of coordinate jurisdiction from exercising any power over it. Farmers' Loan and Trust Co. v. Lake Street Elevated R. Co., 177 U.S. 51, 61, 20 S.Ct. 564, 44 L.Ed. 667. The court which first acquired jurisdiction through possession of the property is vested, while it holds possession, with the power to hear and determine all controversies relating thereto. It has the right, while continuing to exercise its prior jurisdiction, to determine for itself how far it will permit any other court to interfere with such possession and jurisdiction. Palmer v. Texas, 212 U.S. 118, 126, 129, 29 S.Ct. 230, 53 L.Ed. 435." Lion Bonding Co. v. Karatz, 262 U.S. 77, 43 S.Ct. 480, 484, 67 L.Ed. 871. See also Lake Superior Iron Co. v. Brown, Bonnell & Co., C.C., 44 F. 539, affirmed 141 U.S. 475, 12 S.Ct. 28, 35 L.Ed. 824; Lang v. Choctaw R. Co., 8 Cir., 160 F. 355; Berg v. Fidelity & Casualty Co., 10 Cir., 274 F. 311; Sullivan v. Algrem, 8 Cir., 160 F. 366; Mound City Co. v. Castleman, 8 Cir., 187 F. 921, appeal dismissed 235 U.S. 689, 35 S.Ct. 204, 59 L.Ed. 427; U. S. v. Sterling, D.C., 291 F. 695.

The jurisdictional objections of B P must accordingly be overruled. B P, or its trustees if they so desired, may have until January 21st to file objections to the merits of the petition as provided by my order of October 20, 1938, and the petition may stand assigned for hearing on the merits on January 30th, 1939, at New Haven, at 10:30 A. M.

Ordered accordingly.